**Decided June 6, 1986**

F I L E D
Clerk
District Court

JUN 0 6 1986

For The Northern Mariana Islands
By _____
(Deputy Clerk)

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

EDWARD TEMENGIL, et al., ) CIVIL ACTION NO. 81-0006
 )
 Plaintiffs, )
 )
 vs. )
 )
TRUST TERRITORY OF THE PACIFIC )
ISLANDS; JANET McCOY, High ) DECISION
Commissioner of the Trust )
Territory of the Pacific )
Islands; UNITED STATES )
DEPARTMENT OF THE INTERIOR; )
DONALD HODEL, Secretary of the )
Interior; UNITED STATES OF )
AMERICA, )
 )
 Defendants. )
 )

Before the Court are cross motions for summary judgment brought on behalf of the plaintiff class, the Trust Territory of the Pacific Islands and the United States.[1] The issues presented for decision by the motions concern the Trust Territory's practices governing the compensation of its employees

---

[1] Also named as defendants in this action are the High Commissioner, the United States Department of the Interior and its Secretary. It has already been determined that the defendant officials are sued in their official capacity only making the action one properly against the two governments. See Temengil v. Trust Territory of the Pacific Islands, 33 FEP Cases 1027, 1029 n.5 (D.N.M.I. 1983)(Temengil I). Accordingly, throughout this decision, the defendants will be referred to only as the Trust Territory and the United States.

in the Northern Mariana Islands on and after January 9, 1978. Specifically, at issue are the plaintiffs' claims that the defendants' actions : 1) violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; 2) transcend similar guaranties embodied in the Trust Territory Bill of Rights; and 3) constitute a breach of fiduciary obligations set forth in the Trusteeship Agreement between the United States and the United Nations Security Council. The instant motions, by stipulation of the parties, address only the issue of liability. Questions of damages will be addressed if and when necessary. After thorough consideration of the factual matters presented and legal theories advanced, this Court concludes that the promulgation, ratification and/or maintenance of the disputed wage scales violates principles of equal protection and breaches the fiduciary responsibilities embodied in the Trusteeship Agreement. Accordingly, summary judgment in favor of the plaintiffs is granted.

## I. FACTUAL BACKGROUND
### A. Historical

The material facts on the issue of liability are not in dispute. Although the factual background has been extensively reviewed in previous decisions of this Court in this matter, the sequence of events leading up to this dispute will be briefly set forth.

Following the eviction of the Japanese Imperial forces

by the combined Armed Forces of the United States in 1944, the United States assumed control over the northern islands of the Marianas archipelago.[2] The islands were governed by the United States Navy in the immediately ensuing years.[3] In 1947, the Security Council approved, and the United States Congress ratified, the Trusteeship Agreement for the Former Japanese Mandated Islands.[4] This agreement created the Trust Territory of the Pacific Islands consisting of the islands formerly held by Japan under mandate of the League of Nations.

Pursuant to the Trusteeship Agreement, the United States as administering authority assumed full powers of "administration, legislation and jurisdiction" over the territory. Trusteeship Agreement, Art. 3. The United States

_____

[2] Guam, the southern-most island in the Marianas chain, has been under the sovereignty of the United States since 1898, with the exception of a brief Japanese occupation between 1942 and 1944. R. Gale, The Americanization of Micronesia: A Study of the Consolidation of U.S. Rule in the Pacific, 31 (1979) (Gale); D. Farrell, Liberation-1944, 157-169 (1984).

[3] The former Japanese Mandated Islands were under the jurisdiction of the United States Naval Military government immediately following the defeat of the Japanese forces. D. Richard, United States Naval Administration of the Trust Territory of the Pacific Islands, 3 (1957). Following the approval of the Trusteeship Agreement by Congress, the Navy established a civilian government. Id.

[4] 61 Stat. 3301, T.I.A.S. No. 1605; Congress approved the Trusteeship Agreement on July 18, 1947 by Joint Resolution. H.J.Res. 233, 61 Stat. 397 (1947).

pledged to "promote the development of the inhabitants of the trust territory toward self-government or independence" as the people so desired and agreed to promote the "economic advancement and self-sufficiency of the inhabitants." Trusteeship Agreement, Art. 6(1) and 6(2). Importantly, the United States committed itself to

> "promote the social advancement of the inhabitants and to this end... protect the rights and fundamental freedoms of all elements of the population without discrimination."

Trusteeship Agreement, Art. 6(3).

Over the course of the next fifteen years, the trust territory was governed by the Navy and by the Department of the Interior pursuant to a series of executive orders.[5] In 1962, President Kennedy delegated full authority over the trust territory to the Department of the Interior.[6] Pursuant to this

---

[5] President Truman initially delegated administrative responsibility for the Trust Territory civilian government to the Secretary of the Navy pursuant to Executive Order No. 9875. In 1951, this authority was transferred to the Secretary of the Interior under Executive Order No. 10265. 16 Fed.Reg. 6419 (1951), reprinted in 1951 U.S. Code Cong. & Ad.News 1053. Pursuant to Executive Order No. 10408, 17 Fed.Reg. 10277 (1952), reprinted in 1952 U.S. Code Cong. & Ad.News 1105 and Executive Order No. 10470, 18 Fed.Reg. 4231 (1953), reprinted in 1953 U.S. Code Cong. & Ad.News 1030, the Navy was again delegated authority over what is now known as the Northern Mariana Islands, with the exception of Rota, authority over which remained with the Secretary of the Interior.

[6] Exec.Order No. 11021, 27 Fed.Reg. 4409 (1962), reprinted in 1962 U.S. Code Cong. & Ad.News 4338.

606

delegation, the Interior Secretary vested governing authority in a High Commissioner and judicial authority in a High Court.[7] In 1964 the Interior Secretary issued Secretarial Order No. 2882 creating the Congress of Micronesia, a popularly elected bicameral body with authority over legislative matters. The High Commissioner and the Secretary retained veto authority. See S.Rep.No. 433, 94th Cong.1st Sess. 29 (1975).

In the late 1960's the inhabitants of the territory began assertively pressing their demands for future status negotiations.[8] While initially the representatives of the people collectively pursued avenues of independence or free association, eventually negotiations deteriorated. The people of the Northern Mariana Islands desired a closer political association with the United States and entered into separate negotiations.[9] The culmination of these separate talks was the Covenant

---

[7] Initially, the High Commissioner was appointed and served at the will of the Secretary of the Interior. Since 1967, the High Commissioner has been appointed by the President with the advice and consent of the Senate pursuant to 48 U.S.C. §1681 (a); the Interior Secretary retains authority over the justices of the High Court. See Temengil I, 33 FEP Cases 1033 n.22.

[8] See Temengil I, 33 FEP Cases at 1033 notes 24-25 and accompanying text.

[9] See generally, A. Leibowitz, The Marianas Covenant Negotiations, 4 Fordham Int'l. L.J. 19, 19-22 (1981)(Leibowitz); P. Leary, The Northern Marianas Covenant and American Territorial Relations, Institute of Governmental Studies Research Report 80-1, 5-11 (Berkeley 1980).

to Establish the Commonwealth of the Northern Mariana Islands in Political Union with the United States.[10] Essentially, the Covenant preserves for the people of the Northern Mariana Islands the right to local self-government while delegating to the United States "complete responsibility for and authority with respect to matters relating to foreign affairs and defense". Covenant §104. The Covenant was ratified by the people of the Northern Marianas in a plebiscite held on June 17, 1975 and received Congressional approval by joint resolution on March 24, 1976.[11] Several of the Covenant's provisions became operative upon approval by Congress, while others became effective on January 9, 1978, the effective date of the Constitution of the Northern Mariana Islands[12] The balance will be triggered by the declaration of the President of the United States regarding the termination of the Trusteeship. Covenant §1003. Since January 9, 1978, the Commonwealth has been governed internally by a three-branch government established by a locally drafted and promulgated Constitution.[13]

---

[10] P.L. No. 94-241, 90 Stat. 263, (1976) reprinted in 48 U.S.C.A. §1681 note.

[11] Ibid.

[12] Covenant § 1003. The Commonwealth Constitution became operative by Presidential Proclamation No. 4534. 42 Fed.Reg. 56593 (1977), reprinted in 1977 U.S. Code Cong. & Ad.News 4600.

[13] See Temengil I, 33 FEP Cases at 1033 note 28 and accompanying text.

608

Following Congressional approval of the Covenant, the Secretary promulgated Secretarial Order No. 2989[14]/which administratively segregated the Northern Mariana Islands from the rest of the Trust Territory. Created under the Order was the Northern Mariana Islands Legislature and the Office of the Resident Commissioner. The High Commissioner retained limited residual authority during the effectiveness of the Order. On January 9, 1978, the effective date of the Commonwealth Constitution, the provisions of the Covenant and the Commonwealth Constitution superceded the Trust Territory's secretarily-conferred authority over the Northern Mariana Islands.[15]/

However, the Trust Territory Headquarters remains on Saipan.[16]/ Even though legislative, executive, and judicial matters are carried out by the constitutional governments of the four evolved entities,[17]/ the Trust Territory government retains

---

[14]/ 41 Fed.Reg. 15892 (1976).

[15]/ See Temengil I, 33 FEP Cases at 1036.

[16]/ Repeated plans to relocate the Headquarters were never implemented. Temengil I, 33 FEP Cases at 1034.

[17]/ The status negotiations for the rest of the Trust Territory resulted in the creation of three separate states: the Republic of Palau; the Federated States of Micronesia (composed of the former districts of Pohnpei, Truk, Yap and Kosrae) and the Republic of the Marshall Islands. These newly created entities have negotiated separate Compacts of Free Association with the United States all of which have received majorities in respective plebiscites. The Compacts for the Federated States of Micronesia and for the Marshall Islands have been approved by Congress. P.L. 99-239, 99 Stat. 1770 (Jan. 14, 1986). Palau's Compact is now being reviewed by Congress.

some administrative authority related primarily to "budgeting and accounting responsibilities for monies the Trust Territory government transfers from the United States to the governments of [the Marshalls, the Federated States of Micronesia and Palau]."[18] Accordingly, even beyond January 9, 1978, it was necessary to staff the Trust Territory Headquarters which remained on Saipan. Nearly all of the employees of the Trust Territory Government employed since 1979 have been stationed on Saipan. Stipulated Fact No. 9 (S.F.9).[19]

## 2. The Wage Scales

The United States' administration of the Trust Territory produced a rapid change in the economy of the islands, substituting a money economy for the subsistence economy familiar to the people. The post-war money economy has been heavily dependent on government employment.[20] The employment and compensation of government employees proceeded in haphazard and

---

[18] Secretarial Order No. 3039, 44 Fed.Reg. 28116 (1979). Defendant United States Memorandum in Support of Defendants' Motion to Dismiss (filed Mar. 5, 1981) at 7.

[19] The parties have stipulated to a set of facts and a series of documents for the purposes of these motions. Stipulated facts will be referred as "S.F." followed by the appropriate number; likewise, Stipulated Documents will be identified by name and by "S.D." followed by the corresponding number.

[20] In 1973, 41.2% of those employed in the money economy were on the government payroll. Congress of Micronesia, Five-

610

confused fashion. There is no evidence to suggest that any substantial efforts were made prior to 1969 to establish a uniform, consistent compensation practice. The result was an utterly chaotic personnel policy. By 1969, the government work force was composed of roughly 5,000 Micronesian employees, 300 United States Civil Service employees and 400 United States contract employees.[21] Employees in each of these three categories operated under a wage plan unique to their particular category. Within each category, there was inconsistency, confusion and inequity. As a result, there were over 1,300 position titles, many of which were duplicative or overlapping. EMS Report, supra, note 21, at 11. The position classifications had no common standard since there was no description and definition of the range and limits of duties and responsibilities covered by the job titles. This state of affairs created "a fertile ground for discrimination."[22]

_____

Year Indicative Development Plan (1976-1981) 7 (1976)(Five-Year Development Plan). See generally, Department of Education, "Proposal for a Single Salary Schedule for Certified Personnel," at Part III (July 1969)(DOE Report)(S.D.34); A. Spoehr, Ethnology of a War Devastated Island, 41 Fieldiana: Anthropology 5, 125-126 (1952)(Spoehr).

[21] Executive Management Service, "Report and Recommendations on the Position Classification and Salary Plans," 3 (1969)(EMS Report)(S.D.33).

[22] EMS Report, supra note 21, at 1.

Realizing this, the Trust Territory Government and the Congress of Micronesia set out to review pay practices and to recommend a comprehensive compensation scheme to meet the stated policy of "equal pay to those of equal qualifications for equal work throughout the Trust Territory Government."[23] The culmination of this review was the adoption by the Congress of Micronesia in 1971 of a compensation plan which provided for equal pay for equal work for all employees of the Government. This legislation was vetoed by the High Commissioner.[24]

In 1972, the Congress of Micronesia enacted P.L. 4C-49 which established a comprehensive pay plan.[25] The plan officially adopted segregated pay scales which in essence perpetuated the pay practices which had developed through the years of inattentive management.

The Fifth Congress of Micronesia viewed the bifurcated compensation policy with dismay noting that "[t]he new plan does not provide equal pay for equal work with equal qualifications", a policy which must remain the "highest goal."[26] However, the

---

[23] Secretary of the Interior Walter Hickel, quoted in EMS Report supra note 21, at 1.

[24] See S.S.C.REP No.5-88, 5th Cong. of Micronesia, 1st Sess. 485 (1973)(S.D.6); see infra pp.79-82.

[25] The concession by the Congress to enact separate compensation plans based on citizenship was not entirely voluntary. See infra p.83.

[26] S.S.C.Rep. No. 5-88, supra note 24, at 491.

Congress found itself "faced with the reality" that the Trust Territory Government continued to employ expatriates who demanded mainland labor market salaries.[27] The Fifth Congress "regretfully" continued the wage plan but demanded that "the Administration... develop timetables and implement programs directed toward the replacement of all expatriate personnel with Micronesian citizens."[28]

P.L. No. 6-65, the Salary Act of 1975, S.D.1, perpetuated the wage imbalances. Based on the recommendations of a retained consultant, Golightly and Co., the act established a base salary at which Trust Territory citizens would be compensated and encorporated a "market place differential" stated in percentage figures, which would be added on to the pay figures of United States citizens. These differentials ranged from 55.4% to 198.0%. P.L. No. 6-65, Section 6.

The schedules embodied in P.L. No. 6-65 were extended several times during the next few years until the Interior Secretary issued Secretarial Order No. 3027[29] which dissolved the Congress of Micronesia and transferred legislative authority to the interim governments of the emerging nations. Faced with the

---

[27] Ibid.

[28] Ibid.

[29] 43 Fed.Reg. 49858 (1978).

imminent expiration of the most recent extension of P.L. No. 6-65, the High Commissioner took action via Executive Order to again extend the bifurcated pay scale which governed the compensation of employees of the Trust Territory Government.[30]/ In 1978, the High Commissioner again extended the life of the pay scales.[31]/

In 1979, the High Commissioner by Executive Order No. 119 implemented a new pay plan. S.D.23. While Executive Order No. 119, in effect, continues the tripartite wage scales, it differs from previous plans in several significant respects. The new salary schedule eliminates the rubric of "market-place differentials" and instead adopts three separate wage schedules. Trust Territory citizens and citizens of "Southeast Asian" countries who were employed on Saipan are compensated at Schedule I. Schedule III Replaces the previous variable market place differential formulas under which citizens of the United States, Canada, the United Kingdom, Australia and "Northwest European" countries are paid. Compensation under wage Schedule III is approximately twice that paid under Schedule I. S.F.35. Employees who are citizens of other countries are compensated at Schedule II, the levels of which are set between Schedules I and III. S.F.24. Another significant change appears also at Section

---

[30]/ Exec.Order No. 117 (S.D.21).

[31]/ Exec.Order No. 118 (S.D.22).

6 regarding the compensation of United States citizen employees hired on a "local hire" contract. Formerly, local hire employees were paid at a base salary plus a discretionary differential. Execcutive Order No. 119 compensates at the full Schedule III level. The other material provisions of Executive Order No. 119 perpetuated the previous policies. The salary plan established by Executive Order 119 continues in force and effect with minor modifications. S.F.26.

## II. EMPLOYEES' CLAIMS

The plaintiff class pursues a remedy for the allegedly discriminatory wage scales on several grounds.[32] Against the Trust Territory, plaintiffs allege violations of 42 U.S.C. §1981,[33] and of equal protection guaranties embodied in the Fifth and Fourteenth Amendments to the United States Constitution[34]

---

[32] In addition to those claims still at issue here, plaintiffs had alleged violation of 42 U.S.C. §§2000(d) et. seq. (Title VI) and 42 U.S.C. §§2000(e) et. seq. (Title VII); however, these claims were dismissed in Temengil I, 33 FEP Cases at 1028-1029.

[33] 42 U.S.C. §1981 provides:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

[34] Since the equal protection analysis under the 5th and 14th Amendments is the same, this Court has previously found it unnecessary to decide which clause specifically acts as the limitation. Temengil I, FEP at 1060.

enforceable through 42 U.S.C. §1983.[35/] Plaintiffs additionally ground their equal protection claim on Section 7 of the Trust Territory Bill of Rights codified at 1 T.T.C. §7.[36/] Also, plaintiffs allege that the actions of the Trust Territory which are at issue here violate Article 6(3) of the Trusteeship Agreement. The plaintiffs also complain against the United States, alleging that it violated its fiduciary obligations under the Trusteeship Agreement. In the instant motion, plaintiffs seek summary judgment as to liability on all claims against the Trust Territory and the United States.

In separate cross-motions the Trust Territory and the United States seek summary judgment on all claims, asserting that plaintiffs have demonstrated no invidious discrimination actionable under 42 U.S.C. §1981 and §1983. Also, both governments move for judgment on the Trusteeship Agreement claims.

Briefly, then, the claims pursued by the plaintiff class can be divided into two broad categories:

---

[35/] 42 U.S.C. §1983 provides:

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[36/] For text of 1 T.T.C. §7 see infra p.92.

616

those founded on principles of equal protection, and those relying on the provisions of the Trusteeship Agreement. The claims and defenses will be addressed accordingly.

## III. EQUAL PROTECTION CLAIMS[37]

The equal protection clause of the Fourteenth Amendment prohibits class-based discrimination which is not sufficiently related to a permissible government objective. Official action can transcend the bounds of equal protection in two ways. It can be "facially discriminatory" in that it "explicitly classifies or distinguishes among persons by reference to criteria - such as race, sex, religion or ancestry - which have been determined improper bases for differentiation." De La Cruz v. Tormey, 582 F.2d 4549 (9th Cir. 1978), cert. denied, 441 U.S. 965 (1979). Or, an action which is facially neutral may nonetheless produce results which demonstrate a disproportionate impact on a class of persons identifiable by similar traits or characteristics. De La Cruz, 582 F.2d at 50. Not all classifications, overt or covert, violate principles of equal protection; rather, it is only those

---

[37] The plaintiffs rely on the equal protection component of §1981 and the constitutional doctrine underlying §1983. The Supreme Court has determined that the equal protection analysis under either statute is functionally the same. General Building Contractors Ass'n. v. Pennsylvania, 458 U.S. 375, 389-390, 102 S.Ct. 3141, 3149, 73 L.Ed. 2d 835 (1982). Thus, the Court treats the two claims as one under equal protection.

617

which cannot be explained in terms of "non-invidious purposes." Id. Both types of equal protection analysis will be addressed here.

## A. Overt Classification

### 1. Standard of Review

A classification which is based on race, national origin or other such class is itself "immediately suspect" and subject "to the most rigid scrutiny." Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944). Under this "most rigid scrutiny", the subject classification will survive only upon the government's demonstration that the categories drawn are "necessary" to meet an "overriding" state interest. Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967).

The challenged pay scales are drafted in terms of "citizenship." Those "employees who are citizens of the Trust Territory" are paid under one wage scale while those "employees who are citizens of the United States" are paid under another preferred scale.[38/] To trigger exacting judicial review, plaintiffs must demonstrate that this operative language overtly discriminates against a "suspect" class. Plaintiffs contend that

---

[38/] P.L. 6-65, supra p.11, at §§5-6. Executive Order No. 119, supra p.12, also at issue here, incorporates the identical language.

618

the compensation plan in fact so discriminates, arguing that pay practices amount to "flagrant discrimination based ultimately on race and national origin."[39] Defendants on the other hand argue that the wage scales are founded only upon citizenship and thus are permissible and do not trigger strict judicial scrutiny.[40]

Initially, it is noted that the Trust Territory does not argue that there should be no shifting of the burden. Rather, it maintains that the classification distinguishes in terms of "citizenship" or "alienage" and so triggers a review less searching than that necessitated by a racial classification.[41] The Court concludes that those categories implemented by the Trust Territory which treat Trust Territory citizens and United States citizens differently for purposes of wage compensation are inherently suspect and deserve an exacting review.

An appropriate starting point for an analysis of the challenged classification is a review of the United States Supreme Court's opinions regarding distinctions based on alienage. As a general matter, in reviewing classifications based on alienage, the Supreme Court has examined the governmental body

---

[39] Plaintiffs' Memorandum 13.

[40] Brief in Support of TTPI Defendants' Motion for Summary Judgment 17.

[41] Ibid., at 17-19.

AO 72
(Rev. 8/82)

taking the questioned action and the authority from which the government asserts its power to act.[42] Where a state has employed a classification based on alienage, the Court has considered the action "inherently suspect and subject to close judicial scrutiny." Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971). Supporting this conclusion, the Supreme Court has cited the "discrete and insular" nature of the class of aliens and their guaranty of the equal protection of the laws, along with citizens, under the Fourteenth Amendment. See Graham, 91 S.Ct. at 1852. Thus, the Court has concluded that strict scrutiny is the rule and other standards of review the exception. Ambach v. Norwick, 441 U.S. 68, 75, 99 S.Ct. 1589, 1593, 60 L.Ed.2d 49 (1979).

One exception mentioned in Ambach is termed the "rule of governmental functions". 99 S.Ct. at 1593. This rule refers to state action barring non-citizens from participating in those essential government functions which "lie at the heart of our political institutions." Foley v. Connelie, 435 U.S. 291, 296, 98 S.Ct. 1067, 1071, 55 L.Ed.2d 287 (1978). The Court emphasized that while aliens are active participants in community life, the right to govern is a right uniquely reserved to citizens. Foley

---

[42] See generally Note, A Dual Standard for State Discrimination Against Aliens, 92 Harv.L.Rev. 1516 (1979); Note, Dual Standard; L. Tribe, American Constitutional Law, 281-283 (1977).

620

v. Connelie, 98 S.Ct. at 1070. States may accordingly retain distinctions between citizens and aliens where it is "fundamental to the definition and government of a State." Ambach v. Norwick, 99 S.Ct. at 1593. Thus, the Court has upheld state laws or regulations which prohibit the employment of non-citizens on the police force, Ambach v. Norwick, which prevent aliens from becoming teachers, Foley v. Connelie, and which establish citizenship as a prerequisite to employment as a state probation officer. Cabell v. Chavez-Salido, 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982). Where a core governmental function is involved, the Court will examine the classification only to ensure that it is rationally related to the state's legitimate objective. Note, Dual Standard, supra note 42, at 1518.

In addition to identifying this line of cases to support its conclusion that the proper review depends "on the amount of discretion that the government requires to accomplish its objectives, and the importance of those objectives,"[43/] the Trust Territory relies on cases involving federal regulation of aliens.

The Trust Territory correctly notes that Federal discrimination against aliens has been treated in a manner very different from similar state classifications. See Note, Dual Standard, supra note 42, at 1516 n.3. Thus, in Fiallo v. Bell,

_____

43/ Brief in Support of TTPI Defendants' Motion for Summary Judgment 23.

621

430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), which concerned a special immigration preference status for children or parents of lawful United States residents, the Court upheld the challenged classification following a "narrow judicial review" under which the challenged classification was given "special judicial deference." 97 S.Ct. at 1478. Similarly, when faced with a challenge to a congressional delegation to the Attorney General of discretionary authority to waive visa inadmissibility, the Court upheld the exercise of discretion, satisfied that the reasons advanced in its support were "facially legitimate and bona fide." Kleindienst v. Mandel, 408 U.S. 753, 769, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972). The Court on another occasion has stated the narrow standard to which federal alien classifications will be subject, upholding a discrimination among aliens on the ground that it was not "wholly irrational." Mathews v. Diaz, 426 U.S. 67, 83, 96 S.Ct. 1883, 1893, 48 L.Ed.2d 478 (1976).

The narrow standard of review of federal alien classifications does not indicate a relaxing of the Court's position stated in Graham, nor does it represent a conflicting line of decisions. Rather, the Supreme Court rests its lenient treatment of federal regulation of aliens on unique national powers granted by the Constitution. On a previous occasion, the Court found it "pertinent to observe" that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war

622

power, and the maintenance of a republican form of government." Harisiades v. Shaughnessy, 342 U.S. 580, 588, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952). See also Toll v. Moreno, 458 U.S. 1, 10, 102 S.Ct. 2977, 2982, 73 L.Ed.2d 563 (1982)(federal authority to regulate the status of aliens derives from its broad authority over foreign affairs). Professor Laurence Tribe has concluded that while the Court has allowed Congress to condition the "entry, stay and naturalization of aliens upon compliance with requirements courts would hold violative of constitutional limits if applied to... citizens", it "would seem that... resident aliens ought to enjoy the same constitutional rights secure from congressional abridgment as are possessed by... citizens." Tribe, supra note 42, at 281, 283.

From these three lines of cases can be extracted only general criteria for determining the appropriate standard of review. The Supreme Court in the past has examined the source and the nature of the governmental authority exercised and the relation of the action taken to that authority to determine the judicial deference mandated. Thus, where a state has employed alienage as a classification criterion, the Court has closely examined the selected classification to see if it is necessary to promote a compelling state interest. This strict review is required because of the general irrelevance of alienage to state actions and the great potential for discrimination due to the political impotence of aliens as a group. However, where the action challenged relates to a fundamental operation or function

AO 72
(Rev.8/82)

of state government from which non-citizens are properly excluded, the Court has looked for only a rational basis due to the State's inherent authority in such areas. Likewise, where the federal government acts on the basis of alienage regarding the "entry, stay or naturalization" of non-citizens, the Court has shown extreme deference due to the unique national nature of immigration authority and the nearly "political nature" of these decisions. Conversely, federal actions which do not touch on aliens qua aliens do not merit the same deference but should instead be critically examined for sufficient justification.

The Supreme Court cases produce no litmus test for state or federal decisions and a fortiori produce no mechanical standard by which to review the facts here presented. The Trust Territory and the trust relationship it represents[44] are unique among American political structures and the issues presented here are of first impression. Thus, the Court will review the source of the authority exercised and the nature of the challenged action to determine what deference should be given to decisions of the Trust Territory regarding alienage and pay classifications.

_____

[44] The Trust Territory government has been found to stand in a fiduciary relationship to the inhabitants of the Micronesian islands and to carry the duties and obligations of a trustee to a beneficiary. See Palacios v. Trust Territory of the Pacific Islands, DCA No. 81-9017, slip op. at 14 (D.N.M.I. (App.Div.) 1983).

Equally important as identifying the authority exercised, there must be an understanding as to the authority not challenged here. The Trust Territory consistently attempts to confuse the actors by making reference to the actions taken by the Congress of Micronesia in promulgating the pay scales in question. As plaintiffs repeatedly note, the defendant here is the Trust Territory government, not the Congress of Micronesia. Plaintiffs complain of acts, or failures to act, on or after January 9, 1978. On that date, authority over the Trust Territory employees on Saipan originally vested in the Congress of Micronesia pursuant to Secretarial Order No. 2989 (Part VIII) was revoked[45] leaving authority thereover reposed with the Trust Territory Government.[46] Thus, while the decisions made and actions taken by the Congress of Micronesia are relevant to the justifications asserted by the Trust Territory in defense of the wage scales,[47] the focus regarding the standard of review is on the Trust Territory and its asserted source of authority.

---

[45] Pursuant to Part XIV of Secretarial Order No. 2989, supra note 12, the effectiveness of the Order, including the vesting in the Congress of Micronesia of legislative authority over the Capitol District, expired pursuant to the terms of the Presidential Proclamation issued under Section 1003(b) of the Covenant. As previously noted, President Carter issued Presidential Proclamation No. 4534 on October 24, 1977, making the Covenant sections identified in 1003(b) effective on January 9, 1978. See supra note 12.

[46] Secretarial Order No. 3039, supra note 16, at §3(a)(8).

[47] See infra pp.38-62.

The authority exercised by the High Commissioner during the period in question traces back to Secretarial Order No. 2918. 34 Fed.Reg. 157 (1968). Order No. 2918 vested in the High Commissioner the executive authority of the Government of the Trust Territory and the responsibility for carrying out the international obligations undertaken by the United States. There can be no serious contention that this language gives the High Commissioner staffing authority. Pursuant to Order No. 2989, which administratively segregated the Northern Mariana Islands, a Trust Territory Capitol District was created, the legislative authority for which was vested in the Congress of Micronesia. Sec.Order No. 2989, Pt.VII, §2. When Secretarial Order No. 2989 was extinguished by Presidential Proclamation 4534, executive authority over the Trust Territory employees reverted to the High Commissioner under Secretarial Order 2918. This was superseded by Secretarial Order 3027 which retained the High Commissioner's staffing authority of the Trust Territory Headquarters. Secretarial Order No. 3029 also vested in the High Commissioner staffing authority to carry out the duties and responsibilities of the Trust Territory Government.

The High Commissioner's jurisdiction in the Northern Marianas after January 9, 1978, however, was greatly limited[48/].

---

48/ See supra pp.7-8.

626

As already noted, the Covenant granted the government of the Northern Mariana Islands a great deal of autonomy over domestic matters including authority over immigration. As for the other political entities, Secretarial Order No. 3039 intended to provide them "the maximum permissible amount of self-government ... pursuant to their respective constitutions." Sec.Order 3039, supra note 18, at §1. The High Commissioner was to arrange "for the transfer, as expeditiously as possible, of executive functions" not required by the Order. Sec.Order 3039, Section 3(a)(4).

The High Commissioner's actions must be viewed in light of the retained authority to determine the appropriate deference to be given to the actions in question. Two important factors predominate. The Trust Territory Government no longer had authority over immigration into the Northern Mariana Islands, since the Covenant extended such authority to the Commonwealth.[49/] Nor did it have authority over defense, which was retained by the United States as administering authority under Article 5 of the Trusteeship Agreement.[50/] Likewise,

_____

[49/] Section 503(a) of the Covenant explicitly made the immigration and naturalization laws of the United States inapplicable to the Commonwealth. Thus, under Section 505, the Commonwealth inherited the Trust Territory immigration laws which it was free to alter. For examples of the exercise of this authority by the Commonwealth, see Sirilan v. Castro, DCA No. 83-9009 (D.N.M.I. (App.Div.) 1984)(regarding the Commonwealth's permanent residency program).

[50/] The President transferred "responsibility for the administration of civil government" to the Trust Territory Govern-

AO 72
(Rev.8/82)

authority over foreign affairs was expressly reserved to the Department of State. Exec. Order No. 11021, supra note 6, at §1. The Covenant specifically granted these powers to the United States upon termination of the Trusteeship Agreement. Covenant, Section 104. Thus, one of the major justifications for the Supreme Court's deference to federal action is absent here. The High Commissioner in perpetuating or establishing wage scales was not acting pursuant to an authority so plenary and unique as to be virtually political and free from judicial oversight. Rather, the High Commissioner was acting under a purely domestic administrative authority generally not shielded from judicial scrutiny.[51/]

---

ment. See Exec.Order No. 11021, supra note 6 (emphasis added). The President retained security authority. Exec. Order No. 11021, at §1.

[51/] The Supreme Court has on occasion justified its reluctance to decide immigration issues on the basis of the political question doctrine, Hampton v. Maw Song Wong, 426 U.S. 88, 101 n.21, 96 S.Ct. 1895, 1904 n.21, 48 L.Ed.2d 495 (1976). At issue in these cases is not an absence of subject matter jurisdiction but justiciably, which refers to a discretional deference to avoid deciding certain controversies. Justice Brennan, writing for the Supreme Court in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), set forth some guidelines for courts to follow when asked to determine the justiciability of questions before the court:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discover-

 Additionally, the actions in question did not in fact relate to a sensitive or political question uniquely within the province and special expertise of the political departments. Baker v. Carr, supra note 51, 82 S.Ct. at 710. The development of employee compensation plans is a routine and general exercise of administrative authority performed by federal, state and local governments as well as by private employers. Nor do these compensation plans present a "lack of judicially discoverable and manageable standards." Id. Equal protection challenges to employee compensation plans are routinely litigated in the federal courts,[52]/ and, in fact, Congress has specifically granted

---

able and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

82 S.Ct. at 710. For the reasons discussed in the text, the Court does not find the challenged authority of the High Commissioner to represent a political question inappropriate for judicial review.

52/ There were 5,017 employment discrimination cases filed nationwide in the various district courts for the twelve-month period ending June 30, 1980. C. Richey, Manual on Employment Discrimination and Civil Rights Actions in the Federal Courts, A-1 (Federal Judicial Center, 1983). This number rose by 23.1 percent in 1982. Id.

the federal courts jurisdiction to review complaints of employment discrimination.<u>53</u>/

Accordingly, this Court does not find present those factors which have persuaded the Supreme Court to give special deference to certain species of decisions of state and federal government regarding aliens.<u>54</u>/ Rather, the use of citizenship to set drastically divergent wage scales is inherently suspect and deserves special scrutiny.

The Trust Territory's other arguments to the contrary simply are not persuasive. In urging the adoption of a rational basis test, the Trust Territory compares the instant situation with federal Indian cases wherein classifications singling out Indians were examined only for a rational relation to a legitimate interest. Trust Territory's Opening Memorandum, pp. 18, 27-28, citing <u>Morton v. Mancari</u>, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) and <u>Livingston v. Ewing</u>, 455 F.Supp. 825 (D.N.M. 1978), <u>aff'd</u>, 601 F.2d 1110 (10th Cir. 1979), <u>cert. denied</u>, 447 U.S. 905 (1979). The Court does not find these cases or the Indian analogy supportive of the Trust Territory's argument.

---

<u>53</u>/ 42 U.S.C. 2000e-5(f)(3).

<u>54</u>/ The Trust Territory concedes that the government objectives of the wage scales are "primarily social and economic rather than political, so that the 'political function' test... is not directly relevant." Brief in Support of TTPI Defendants' Motion for Summary Judgment 27.

In both cases, preferences afforded members of Indian tribes were under constitutional attack. The Supreme Court in _Mancari_ was not moved by the challenge and found that Congress, in enacting the preference, was only fulfilling its historical and legal trust obligation to the Indians. There was no evidence of invidious racial discrimination against the class of non-Indians. In the absence of such evidence, the government needs only to demonstrate that the preference is rationally related to the promotion of the stated goal. 94 S.Ct. at 2483-2485. Likewise in _Livingston_, the district court of New Mexico upheld a museum preference for traditional native American vendors on the basis that the action was not based on race but on the unique responsibilities of the federal government and the state toward Indians. 455 F.Supp. at 831. Again, there was no evidence of invidious discrimination.

This Court has previously recognized the aptness of the analogy between the United States-Indian and United States-Micronesian trust relationships. See _Palacios v. Commonwealth of the Northern Mariana Islands_, Civ.App.No. 81-9017 (D.N.M.I.(App. Div.) 1983) slip op. at 10 ("the very purposes which engendered the judicially created Indian fiduciary doctrine apply a _fortiori_ to the Micronesian-U.S. relationship"). However, there is no analogy between the facts of _Mancari_ and _Livingston_ and the facts here presented. The action taken by the Trust Territory compensating the Trust Territory citizens at a rate approximately half that paid United States citizens does not immediately dispel

AO 72
(Rev.8/82)

an inference of discrimination; rather, it creates one. This is not a case of preferential treatment of a trust beneficiary but of facial discrimination, albeit in the alleged interest of the beneficiary. The justifications in support of the classification, therefore, are more appropriately considered in light of the standard of review and not in support of one.[55/]

The Trust Territory also argues that the "paramount international obligations" arising out of the Trusteeship Agreement[56/] when entered into the equation call for a deferential standard of review. And, the "broad scope of this duty" and the "inherent difficulty of promoting economic self-sufficiency" call for this Court's restraint in reviewing governmental actions. As set forth earlier, the predominantly administrative nature of the authority delegated the Trust Territory and the actual circumstances of the exercise of that authority are not of the type normally shunned by the courts. The Trust Territory's arguments instead are properly advanced as justifications based

---

[55/] The Trust Territory itself identifies other programs which distinguish between Trust Territory citizens and United States citizens. However, unlike the wage plan, these other programs offer preferences to Trust Territory citizens and would accordingly be more appropriately reviewed under a relaxed standard offered in Mancari. See Brief in Support of TTPI Defendants' Motion for Summary Judgment 28-29 (citing economic, housing and education programs open to citizens of the Trust Territory exclusively.)

[56/] Ibid.

632

on the importance of the state's interests and not at the standard of review stage. Moreover, the importance of the obligations imposed on the Trust Territory Government and the fiduciary nature of those obligations supports the adoption by this Court of a more searching review.[57]

Additionally, the Trust Territory cites the devolution of the Government and the need to give deference to decisions hastening the termination of the Trusteeship. These goals do not support an argument that the wage scales are drawn. The assertion that the Government will terminate soon, thereby eliminating the need for the differentials, may demonstrate that the pay discrimination is of short life span, eliminating the need for indefinite injunctive relief. But, in no manner can this event alone justify past discrimination or dissipate the need for remedial monetary relief.

Again, the Trust Territory argues that the discrimination was "self-imposed by a majority group... against itself."[58] Even if the focus at this stage was on the Congress of Micronesia legislation and not on the actions of the High Commissioner, the self-imposed discrimination would not by that

---

[57] See infra pp.93-97.

[58] Brief in Support of TTPI Defendants' Motion for Summary Judgment 29.

fact alone justify judicial deference. The Supreme Court addressed a similar argument in Regents of the University of California v.Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In Bakke, a rejected white applicant to medical school challenged the school admissions policy, which reserved a specific number of slots for minority applicants. Rejecting the University's argument that since the classification was imposed by a majority class to its disadvantage and to the benefit of a minority class and therefore called for deference, the Court said:

> Moreover, there are serious problems of justice connected with the idea of preference itself. First, it may not always be clear that a so-called preference is in fact benign. Courts may be asked to validate burdens imposed upon individual members of a particular group in order to advance the group's general interest. [Citation omitted.] Nothing in the Constitution supports the notion that individuals may be asked to suffer otherwise impermissible burdens in order to enhance the societal standing of their ethnic groups. Second, preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relationship to individual worth. [Citations omitted.]

98 S.Ct. at 2752.

Although Justice Powell announced the judgment of the Court, he did not obtain a plurality on his position regarding the standard of review. However, he was joined by four other Justices (Brennan, Marshall, White, and Blackmun) in his rejection of the deferential, rational basis standard. The

"Brennan four" rejected Powell's suggestion of applying the strict scrutiny standard, but only because "whites as a class [do not] have any of the 'traditional indicia of suspectness'." 98 S.Ct. at 2782 Brennan, J., White, J., Marshall, J., and Blackmun, J., concurring in the judgment in part and dissenting in part) (quoting San Antonio Independent School District v. Rodriguez. 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973)). Thus, a majority of the Bakke court would reject the Trust Territory's position, even accepting the Trust Territory's argument that the compensation plan was enacted by the very class of persons it burdens. See also Weinberger v. Wiesenfeld, 4290 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975)("the mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme").

## 2. National Origin

The challenged classification is deserving of thorough and searching review for another reason --- it significantly relies on national origin for a substantial part of its foundation. Generally, classifications based on alienage have been treated differently from those discriminations based on race or national origin because "the class of aliens is itself a heterogeneous multitude of persons with a wide-ranging variety of ties to [the] country." Mathews v. Diaz, supra, 96 S.Ct. at 1890-1891. Rather, the "suspect" character of the alien class

635

turns on its discrete and insular nature, its burden of stigma and its history of discrimination. See, Note, Dual Standard, supra note 41, at 1525-1527. Thus, as seen above, unlike racial discrimination, the court will not strictly review every alienage classification, but, rather, only those not based upon a state's inherent constitutional power to regulate political functions or upon the federal government's unique authority over the regulation of aliens qua aliens. However, the Court has noted that it will not so readily defer to governmental justifications where alienage is used as a pretext for race or national origin discrimination. See, e.g., Takahashi v. Fish & Game Comm'n., 344 U.S. 410, 418, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948) (suggesting that California's alienage classification may indeed be an "outgrowth of racial antagonism directed solely against the Japanese"). In Oyama v. California, 332 U.S. 633, 636, 68 S.Ct. 269, 270, 92 L.Ed.249 (1948), the Court stated:

> In approaching cases... in which federal constitutional rights are asserted, it is incumbent on us to inquire not merely whether those rights have been denied in express terms, but also whether they have been denied in substance and effect. [Emphasis added.]

Justice Murphy, in his concurrence, added that the decision in Oyama "is dictated by the uncompromising opposition of the Constitution to racism, whatever cloak or disguise it may assume." 68 S.Ct. at 277.[59]

---

[59] See also, Note, Dual Standard, supra note 42, at 1528

 The alienage classifications incorporated into the wage scales vary from the "citizen/non-citizen" distinctions generally reviewed by the Supreme Court in two ways which, taken together, convince this Court that special attention is required. First, the classification not only distinguishes between citizens of the United States and non-United States citizens, it goes further and classifies among aliens according to country of citizenship. This manner is not only unique but is extremely open to national origin discrimination. The "suspect" nature of these discriminations is aggravated by the grouping of countries into categories of generally homogeneous racial populations.

Second, the classification defined as "Trust Territory citizen" is a group which can almost uniformly be classified as Micronesian in ethnic origin. Good reason exists for this statistical purity. "Trust Territory citizenship" is an administrative classification designed by the Trust Territory government to identify those persons who claim origin or ancestry in the islands of Micronesia. "Natural citizens" of the Trust Territory are only those born in the Trust Territory who do not

─────────────────────

("To be sure, the alien population of a particular State may well be composed almost entirely of a single racial or national minority, and distinctions based on alienage may be used to mask discrimination aimed at such a group.")

otherwise acquire another nationality at birth,[60] and those born outside the Trust Territory of parents who are Trust Territory citizens.[61] Qualifications for naturalization are very restrictive requiring, inter alia, that one parent or grandparent be a citizen of the Trust Territory.[62] The restrictiveness of the immigration scheme is demonstrated by the statistics in this action: 100% of the class of Trust Territory citizen employees

---

[60] 53 T.T.C. §1 provides:
§1. Natural citizens. (1) All persons born in the Trust Territory shall be deemed to be citizens of the Trust Territory, except persons born in the Trust Territory, who at birth or otherwise have acquired another nationality.

[61] 53 T.T.C. §1(2) provides:
(2) A child born outside the Trust Territory of parents who are citizens of the Trust Territory shall be considered a citizen of the Trust Territory while under the age of twenty-one years, and thereafter if he becomes a permanent resident of the Trust Territory while under the age of twenty-one years.

[62] 53 T.T.C. §2 provides:
§2. Naturalization; authority of High Commissioner to grant. The High Commissioner may grant Trust Territory citizenship to persons who:
(1) Are eighteen years of age or over;
(2) Are of good moral character, as certified by the district administrator and two leading citizens of the community in which they intend to reside;
(3) Have not acquired, or who renounce, previous citizenship and renounce allegiance to any and all foreign powers and rulers;
(4) Have been permanent residents of and legally domiciled continuously in the Trust Territory for at least five years immediately prior to application for citizenship, and
(a) Have been born of parents, one of whom was a citizen of, and maintained his principal residence in the Trust Territory at the time of the birth; or
(b) Have been born of parents, one of whom has been granted Trust Territory citizenship pursuant to this section.

are Micronesians.[63/] It is hard to imagine another way to define an ethnic class or other class of common national origin which would produce equal or less deviation from the desired goal than does the class defined by the defendants here.

The ethnically pure nature of the class of Trust Territory citizens alone would justify a decision to strictly review the classifications involved here due to its "suspect" nature and potential for hidden or disguised abuses. Considered in conjunction with what has previously been said regarding alienage and the classes here involved, principles of justice and fair play not only warrant a searching review of the classifications chosen, they demand it.

### 2. Trust Territory's Justifications

The Supreme Court has held that "[i]n order to justify the use of a suspect classification, a [government] must show that its purpose or interest is both constitutionally permissible

_____

63/ Answers to Plaintiffs' Interrogatories (filed August 15, 1983). The answer incorporates a computer print-out which lists all Trust Territory citizen employees from January 9, 1978 to August 5, 1983. All 775 employees are listed as having Micronesia as their origin. (Plaintiffs' Exh. 5 to Motion to Certify Class). Micronesians are defined as "persons whose ancestors were the indigenous inhabitants of the former districts of the Trust Territory known as the Marshalls, Truk, Ponape, Kosrae, the Marianas, Yap and Palau." (S.F.31) No statistics were presented regarding the percentage of Trust Territory citizens who are Micronesians.

and substantial, and that its use of the classification is 'necessary... to the accomplishment' of its purpose or the safeguarding of its interest." In Re Griffiths, 413 U.S. 717, 721-722, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910 (1973)(footnotes omitted).

The Trust Territory sets forth two prevailing governmental interests in justification of the use of the challenged wage scales. First, the Trust Territory cites its trusteeship obligation to "promote the economic advancement and self-sufficiency of the inhabitants." Due to the state of the economy of the islands in the post-war period the Trust Territory concluded that it would need to recruit skilled labor from other regions to meet its obligations. Making this recruitment of experienced manpower a goal in itself, the government sought the means to best accomplish this. They concluded that the expatriate expertise would have to be paid at a wage equivalent to the prevailing wage of the labor market from which the manpower was drawn. Believing a unitary pay scale set at a United States wage level to be financially disastrous and economically unsound, the government established the tripartite wage scale to meet its stated goals. Brief in Support of TTPI Defendants' Motion for Summary Judgment 14-15.

Initially, it would be difficult to argue with the Trust Territory's assertion that its goals of promoting "economic advancement" and "self-sufficiency" as mandated by the Trusteeship Agreement are sufficiently compelling to justify some

practices which might not otherwise survive constitutional challenge; however, this proves nothing. Instead, the method by which the Trust Territory recruited and compensated expatriate expertise must be examined both as a goal and as a means of promoting the social and economic ends advanced by the Trust Territory. Secondly, it must be determined whether the compensation plan designed to foster these purposes was "necessary" to actually do so.

The "economic advancement" of the Micronesian people was a difficult task not just in its accomplishment as much as in the definition of the goal. Following the war, Micronesia was devastated. In the views of one commentator, "[w]hen the fighting was over, the Micronesian economy had been set back a quarter of a century."[64] As a general matter, the economy of Micronesia throughout recorded history was one of subsistence. While the various colonial powers established some trade in the islands, no economic boom was brought about, not at least until the Japanese took control of the islands under a mandate from the League of Nations.[65] The Japanese brought large scale agricul-

---

[64] Gale, *supra* note 2, at 42; Spoehr, *supra* note 20, at 91-95.

[65] The mandate system was the immediate predecessor to the trusteeship system of the United Nations. See generally, J. Murray, The United Nations Trusteeship System 7-22 (1957). The Japanese received the mandate following relinquishment of their control by the Germans after World War I. See Micronesia: Winds of Change, 436-438 (F. Hezel, S.J. Berg & M.L. Berg ed.).

tural development to the Marianas concentrating on sugar cane, coffee, cassava and pineapple.[66] While the indigenous population of the Marianas did not participate much in the actual production, their social and economic structure changed significantly. The prime homestead land was used for cane production, thus reducing land available for subsistence cultivation. The Japanese administration leased a large amount of private land[67] from the Chamorro and Carolinian population, and in addition, the Japanese brought in workers to do the manual labor. Thus, the local inhabitants to a large extent lived off the rents obtained from the family land. Also, the inhabitants obtained more income from employment as teachers, policemen, stevedores, nurses, and the like.[68] A money economy began to evolve.

The war destroyed the Marianas, especially Saipan. Over 30,000 lives were lost in the campaign.[69] The towns which the Japanese had erected were destroyed, as were most of the other structures.

---

[66] Spoehr, supra note 20, at 84.

[67] The amount of private land leased to the Japanese Administration has been estimated at greater than 75%. Ibid. at 86.

[68] Ibid. at 87.

[69] The attack on Saipan in June, 1944, involved 127,000 American troops and 535 ships. Over 29,000 Japanese had been killed during the battle and 3,144 Americans. Accurate figures on loss to the local inhabitants is not available. Gale, supra note 2, at 41.

In the fifteen years following the installation of a civilian government, the Trust Territory administration essentially pursued a "hands off" policy regarding Micronesia.[70] In 1961, a United Nations team visited Micronesia and returned with a scathing report.[71] The team expressed upset at the general neglect shown by the United States and by the political, social, and economic underdevelopment of the islands.[72]

The Kennedy administration sought to alter United States policy regarding Micronesia, and in fact did so in dramatic fashion. In 1962, the capitol was moved, for the first time to Micronesia. The Kennedy administration set out to raise living standards by sending American teachers to teach English, adopting American health standards, and sending in the Peace

---

[70] This period has been called one of "benign neglect." Note, Self-Determination and Security in the Pacific, 9 N.Y.J. J. Int'l. L. Politics 277, 283 (1976)(Note, Self-Determination). The same cannot be said of the military's involvement. The thermonuclear tests conducted in the Marshall Islands destroying the ancestral homelands of the inhabitants of Bikini and Enewetak atolls are now well-known. See, e.g., People of Enewetak v. Laird, 353 F.Supp. 811, 813 (D.Haw. 1973); see also Gale, supra note 2, at 283-284. In the Marianas, authority over Saipan and Tinian was transferred back to the Navy. Supra pp.4-5. During this time Saipan was closed to visitors to allow the Central Intelligence Agency to covertly house and train nationalist Chinese guerillas. Gale, supra, at 84; Note, Self-Determination, supra, at 285. Left behind after the abandonment of the C.I.A. camp was a $28 million headquarters complex into which the Trust Territory administration eventually moved. Gale, supra, at 101-102.

[71] D.McHenry, Micronesia: Trust Betrayed 13 (1975)(McHenry).

[72] Ibid.

643

Corps.[73] Actual spending in Micronesia increased from $6.1 million in fiscal 1962 to $15 million in the following year. Johnson continued the trend with "gradual routinization of the extension of federal education, health and labor programs to Micronesia."[74] Not only did this send a great deal of money into Micronesia, important for purposes here, these programs resulted in a "dramatic increase" in the number of personnel in Micronesia.[75] It was this massive infusion of American and other foreign personnel that eventually led to the chaotic pay practices identified above.

The policy decisions made regarding the path of economic development in Micronesia are the type of political question best left to the expertise of the coordinate branches of government.[76] It is beyond the scope of this Court's task, for the purposes of these motions, to analyze and critique the policy decisions made in the 1960s.[77] However, even taking as valid

---

[73] Gale, supra note 2, at 102-103.

[74] Ibid., pp. 109-110.

[75] Ibid.

[76] See discussion of Baker v. Carr and justiciability supra p.___.

[77] However, the Trust Territory should not be allowed to rely on its own misdeeds to justify subsequent unlawful action. Scholarly commentary notes that the policy change of the 1960's while in part altruistic, falling in line with the Democratic attitudes of the time, was more a reflection of a

644

the economic goals established by the Trust Territory and United States governments, it is well within this Court's ability to review the mechanics of implementation of those goals to determine whether they fall outside the limitations imposed by the Constitution.

The issues then may be framed as follows: was the employment of "foreign" personnel compelling as a goal and was it a necessary means to the goal of "economic advancement"? Secondly, were the wage scales necessary to each goal? A review of these issues leaves this Court no alternative but to conclude that the means and ends were neither sufficiently necessary nor substantial enough to justify the resulting discrimination.

In reviewing a classification which touches on an individual's race or ethnic background, the person challenging

---

renewed interest in Micronesia as a vital element of our national security interests. See generally, Note, Self-Determination, supra note 70, at 284; Note, The Marianas, the United States and the United Nations: Uncertain Status of the New Commonwealth, 6 Calif.W.Int'l.L.J. 382, 390, 405, 409, 393; J. Metelski, Micronesia and Free Association: Can Federalism Save Them? 5 Calif.W.Int'l L.J. 162, 165-166; McHenry, supra note 71, at 30; Gale, supra note 1, at 106. Perhaps most telling is the "Solomon Report", a report done at the request of the Kennedy administration. The report details the United States' perceived need to annex the islands to protect its security interests. The Report is discussed in greater detail below. See infra pp.73-77. Thus, the Trust Territory seeks to justify the pay scales as necessary to attract skilled labor which in turn is needed to promote economic development. Yet, the development pursued was not always founded on Trusteeship obligations as much as selfish national security interests.

the classifiction "is entitled to a judicial determination that the burden he[/she] is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." Bakke, supra, 98 S.Ct. 2733. A court's task will encompass an analysis of the chosen scheme to ensure that it provides a sufficiently close fit between the means and ends. Tribe, supra note 42, at 1000-1002. Also, another tool to determine whether the classification is "precisely tailored" is to look for "less restrictive means" available to the government. Tribe, supra, at 999 n.17 and accompanying text.

One immediately apparent flaw in the wage scale is the failure of the chosen classification scheme to sufficiently promote the stated goals. Throughout its brief and at the hearing on the motions, the Trust Territory has attempted to justify the tripartite wage scales with the argument that skilled and experienced labor was needed to meet the Trust Territory's economic development goals. Their argument, already stated earlier, is that such labor with the necessary qualifications could only be found in outside labor markets; thus, a wage competitive with the source labor pool was necessary. Even assuming for the sake of argument that only by paying source pool wages would recruitment be possible,[78] the wage scales were both

---

[78] This premise is by no means self-evident. The economic boom of the 1960's was largely due to the assistance of Peace Corps volunteers who were not paid a prevailing market wage. The phase-down of the Peace Corps program in Micronesia is

646

over-inclusive and under-inclusive in that they paid a premium salary without guaranteeing the desired experience and they discouraged local skill from continued employment. For example, to qualify as a "Systems Accountant-Consultant" with the Headquarters Department of Finance, an applicant would need a degree in business administration or a related field from an accredited college in addition to five years of increasingly responsible experience. Plaintiffs' Exhibit 7 in support of Motion for Class Certification. Once a qualified applicant was hired for this position, he or she would be paid in 1978 at a bi-weekly rate of $371.68 if a Trust Territory citizen and $673.11 if a United States citizen hired on a prime contract. Similarly, a "Mental Health Specialist" with the Headquarters Health Services would need to have graduated from an accredited college or university with a major in social health or behavioral sciences and have five years experience in a related field; in 1978 such an employee would receive bi-weekly salary of $264.96 if a Trust Territory citizen and $528.07 if a citizen of the United States hired on a prime contract. Id.

---

arguably more properly attributable to its successes rather than its failures. See McHenry, supra note 71, at 28. McHenry notes that the curtailment of the program was inspired in part by Interior's dislike of Peace Corps volunteers voicing criticism of American officials and of the Department of the Interior and in part by the Nixon administration's intolerance of Peace Corps lawyers educating Micronesians about their rights.

647

These examples demonstrate the failure of the wage scales in some, if not many, instances to promote the stated goals of recruiting qualified and neeeded labor not available in the Trust Territory. The scales, as drafted, did not operate to ensure that recruited labor in fact had superior skills and experience than was available locally. The evidence indicates that from 1978 to 1983, there were 300 instances in which expatriates held job positions which were also held by Trust Territory citizens.[79/] Thus, the Trust Territory in many instances was not recruiting superior skill and experience but instead was employing expatriates with identical qualifications to those of Trust Territory citizen employees. If the administration were only interested in attracting labor with qualifications not found in the Territory, a single unitary scale setting entry level and advanced wage grade according to skill and experience would have served better the stated purpose.

In several instances the scales had the reverse effect. There is evidence in the record to demonstrate that qualified Trust Territory citizens left the employ of the Trust Territory Government due to the undesirability of working along side a non-Trust Territory citizen in the same position classifi-

[79/] Hearing on Motion to Certify Class (Nov. 17, 1983)(Class Certification Hearing), Reporter's Transcript (RT) at 90; see also testimony of J. Manglona, Class Certification Hearing, RT 50-51; Exh. 6, received at Class Certification Hearing.

cation who made nearly twice the salary.[80]

Perhaps more telling of the failure of the wage scale to provide a sufficiently "close fit" and of the vacuity of the Trust Territory's protestations of good faith in the promulgation of the wage scales are the preferential provisions for "local hire" United States citizens. The "local hire" wage scale was designed to compensate non-Trust Territory citizens who were recruited from within the Trust Territory. See P.L. No. 6-65, §3(8)(b). The Congress of Micronesia had consistently expressed frustration with the Government's system of paying local hires in parity with prime contract employees. In reporting out the Salary Bill Act of 1973, the Senate Committee on Judiciary and Governmental Operations commented favorably on the section of the bill which reduced the salary of local hires to take-home parity with Trust Territory citizens.[81] While realizing that immediate pay reduction would be "difficult in practice" the bill proposed progressive reductions as contracts expired; all new contracts would be subject to the new local hire provisions. The drafters

_____

[80] See, e.g., Plaintiffs' Answer to Defendants' First Set of Interrogatories, no. 4(e); Responses of Defendant Trust Territory of the Pacific Islands to Plaintiffs' Second Set of Interrogatories, no. 8(e)(i).

[81] Under the proposal, local hire United States citizens were given a "Tax Relief Allowance" to offset the federal income tax paid by all United States citizens and not assessed against Trust Territory citizens. S.S.C.Rep. No.5-88, supra note 24, at 489.

of the bill envisioned a three-year period to achieve pay parity between local hires and United States citizens. S.S.C.Rep. No. 5-88, supra note 24, at 490-491. This suggestion was not adopted, leaving local hires with an 80% U.S. differential.

Again, during the development of the 1975 Salary Act (enacted as P.L. No. 6-65) a local hire "phase down" was strongly recommended.[82/] The Senate Committee on Judiciary and Governmental Operations proposed that local hires receive the base salary paid Trust Territory citizens, finding that local hires "compete directly in the labor market with Trust Territory citizens" and concluding that "[t]here is simply no justification for payment of wages any greater than those paid to Trust Territory citizens." S.S.C.Rep. No. 6-133, 6th Cong.of Micronesia, 1st Reg.Sess. 501(1975)(S.D.4). Only under unidentified pressure and following a High Commissioner veto of the previous proposal did the Committee retreat and authorize an 80% market-place differential add-on for local hires. Even so, the Committee was adamant that the local hire differential be eliminated in two years. S.S.C.Rep. No. 6-155, 6th Cong.of Micronesia, 1st Special Sess. 83-84 (1975)(S.D.2). This is

---

[82/] Trust Territory retained consultants Golightly & Co. noted that the phase down of local hire wage rates was adopted by the Joint Salary Task Force as appropriate "after strong statements from attorneys from both houses." Golightly & Co., Summary Report: Salary Act Review and Recommendations 8 (1975) (1975 Golightly Report).

650

reflected in P.L. No. 6-65 at Section 6(2).[83/]

During the next two years, the Trust Territory Administration and the Congress of Micronesia negotiated regarding a viable and mutually acceptable compensation plan. See, e.g., S.S.C.Rep. No. 7-330, 7th Cong.of Micronesia, 2nd Special Sess. 1(1978)(S.D.13)(referring to objections to "administration-sponsored legislation which...would...provide for new Base Salary Schedules."). During the negotiations, P.L.No. 6-65 was continued in effect.[84/]

------------------------------

[83/] Section 6(2) of Pub.L.No. 6-65 provides:

(2) Employees who are citizens of the Untied States and who are recruited and hired under a local-hire contract for service within the geographical boundaries and administrative control limits of the Trust Territory shall be provided the following compensation:
 (a) A Base Salary, as provided in Section 4 of this act; and
 (b) 80% of the U.S. Market Pay Differential as provided under Section 6(1)(b) of this act.
 (c) Paragraph (b) of this subsection shall expire two years following the effective date of implementation of this act. Commencing on the date of such expiration, the Adjusted Base Salary for these local-hire contracts shall be reduced, without benefit of any phase-down schedule, directly to the Base Salary Rate only, as provided for in Section 4 of this act.

[84/] P.L. No. 6-98, effective April 11, 1976, extended the expiration date of the Salary Schedules to October 10, 1977. S.F.15. The deadline was postponed to October 7, 1978 by the enactment of Pub.L.No. 7-10. S.F.16; S.D.20(b). The enactment of Pub.L.No. 7-136 extended the life of the wage scales to February 28, 1979. S.F.19; S.D.20(a).

651

Again, a major point of disagreement was the compensation of local hire United States citizens. In 1978, the Trust Territory administration sponsored legislation which would have replaced the salary schedules of P.L. No. 6-65 with a new compensation plan.[85/] Under H.B. 7-403, United States citizens, whether employed on prime contracts or as local hires would have been paid under the same schedule; Trust Territory citizens would have been paid under a separate schedule. The Congress of Micronesia would not adopt this proposal, instead devising a compromise which would have established local hire compensation at the Trust Territory citizen level. However, the Committee amendment provided that a "reasonable differential may be added in cases where warranted" as determined by the Director of Personnel with the approval of the Personnel Board and the High Commissioner. H.S.C.Rep. No. 7-296, 7th Cong. of Micronesia, 2nd Reg.Sess. 4(1978)(S.D.32). The Senate tabled H.B. 7-403 following a committee report suggesting rejection of the bill as too costly.[86/] Ultimately the Trust Territory administration was able to implement its policy. Executive Order No. 119 provided for compensation of United States citizen employees at Schedule III "whether recruited on a prime contract or a local hire contract." Exec.Order No.119 at 4.

---

[85/] The legislation was introduced as H.B.7-403, 7th Cong.of Micronesia, 2nd Reg.Sess. (1978)(S.D.30).

[86/] See S.S.C.Rep. No. 7-329, 7th Cong. of Micronesia, 2nd Reg.Sess. (1978)(S.D.31).

The adoption of a pay formula at which local hire employees are compensated at a rate equal to that of prime contract employees poignantly demonstrates the inadequacies of the wage scales. The Trust Territory has consistently defended the scales as necessary "to attract candidates from labor areas where the prevailing rates of pay were higher than those in the Trust Territory." Trust Territory's Opening Memorandum at p.9 (quoting 1975 Golightly Report supra note 82, at 9). Quite obviously, as the Committee on Judiciary and Governmental Operations noted, there is no need to attract potential employees who already reside in the Trust Territory. The beneficial provisions for locally hired United States citizens amply demonstrate that the wage scales are not tailored with the preciseness required where suspect classifications are used.[87]

The lack of the "close fit" demanded of classifications such as those used here is further evidenced by the lack of precision in the differentials as drafted. When originally adopted in a comprehensive pay plan the differentials were based on the prevailing market rates of the source labor markets.

---

[87] Not only does the local hire provision show the overinclusiveness of the classification, the process involved in its adoption and the attitudes of the Administration evidenced therein demonstrate illicit motive on the part of the Trust Territory. See infra pp.66-88.

Section 7 of P.L. No. 6-65[88]/provided that employees who were neither Trust Territory citizens nor United States citizens would receive, in addition to the base salary, a Market Place Differential as determined by the Director of Personnel based on the difference "between the prevailing rates in the Trust Territory and those in the country of citizenship." A plan so designed allowed for "flexibility in determining the standard percentages of base salary for the... premium" so the differentials could "vary as prevailing rates change" and to more accurately achieve the goal of attracting skilled labor out of their labor market. S.S.C.Rep. No.5-88, supra note 24, at 489-490

---

[88]/ Section 7 of P.L. 6-65 provides:

Compensation of Third-Country Nationals. Except as provided in Section 8:
(1) Employees who are citizens neither of the Trust Territory nor of the United States and who are recruited and hired under a prime contract, or under a local-hire contract for service in locations outside the geographic boundaries or administrative control limits of the Trust Territory, shall be provided the following compensation:
(a) A Base Salary, as provided in Section 4 of this act; and
(b) In cases where prevailing rates of pay in the country of citizenship are significantly higher than in Micronesia, a Market Place Differential; PROVIDED, that such a Market Place Differential shall be determined by the Director of Personnel, with the approval of the Trust Territory Personnel Board and the High Commissioner, on the basis of the difference, insofar as it can be best estimated, between the prevailing rates in the Trust Territory and those in the country of citizenship. In no case shall such a Market Place Differential exceed 90 percent of the United States Market Place Differential at the same pay level and step, or exceed the percentage of the United States Market Place Differential set forth in the following table, whichever is less:

654

(referring to a similar provision in P.L. No. 4C-49).

Executive Order No. 119 abandons the floating differential for non-Trust Territory citizens and establishes three inflexible schedules. United States citizens are compensated under Schedule III as are citizens of "Canada, the United Kingdom, Australia [and] Northwest European countries.[89/] Exec.Order No. 119, §6. Under Schedule I are paid Trust Territory citizens and "citizens of Southwest Pacific or Southeast Asian countries (including, without limitation, the Republic of the Philippines, Korea, and China).[90/] Id., §6(2). Citizens of all other countries are salaried under Schedule II.

TABLE OF FOREIGN NATIONAL
RECRUITMENT PERCENTAGES BY COUNTRY OF CITIZENSHIP

Percent of U.S. Market Place

| Differentials | Country of Citizenship |
|---|---|
| 90% | Canada |
| 75% | Northwestern Europe |
| 65% | Australia |
| 50% | Latin America |
| 50% | New Zealand |
| 25% | Malaysia |
| 0% | Southwest Pacific Areas (including, without limitation, the Republics of the Philippines, Korea, and China). |

[89/] "Northwestern European countries" is not further defined.

[90/] Other than the reference to the Philippines, Korea and China, "Southwest Pacific or Southeast Asian countries" is not defined.

_Id._, §6(3). The rigidity of this plan itself evidences its marginal use at promoting the desired goals. There is no room for developing a differential to adjust salaries of potential employees recruited from unlisted "third" countries. Nor is there provision to adjust the differentials as labor conditions and prevailing wages fluctuate relative to conditions existing in the Trust Territory. The plan has an extremely loose "fit" at best creating gross, unjustified pay discrepancies.

In addition to the inflexibility of the Executive Order No. 119, the Trust Territory has produced no evidence to justify the labor market clusters themselves. Omitted are the differentiations among the Canadian, European and Australian labor markets which were included in P.L. No. 6-65 after initial economic studies.[91/] Instead, these countries are all included with the United States, presumably according to labor market conditions. Yet, the Trust Territory has produced no evidence to justify this grouping. The High Commissioner under whose signature the Order was promulgated was unable to support the clusters with any data.[92/] Nor is there any other evidence which demonstrates factual support for the groupings.

---

91/ The differential percentages were originally proposed by Golightly & Co. based upon prevailing wage rates of the listed countries. 1975 Golightly Report, _supra_ note 82, at 13.

92/ See Deposition of Adrian P. Winkel (4/16/81)(Deposition). Secretary Winkler stated that he wasn't "personally... familiar with the source of the data and didn't recall that any data had in fact been presented to him." Deposition 16-17. Nor was Winkel able to identify persons whom he knew to have obtained or analyzed such information. Deposition 23-24.

656

The pay scales as adopted by the Trust Territory administration after January 9, 1978 are only roughly drafted to meet the stated goal of recruiting needed skilled personnel to staff the government which chose to remain physically in the Commonwealth. The scales lost what little flexibility existed in the previous plans and in their rigidity created even greater gaps between the income earned by Trust Territory citizens living and working in the Commonwealth and that earned by others. The Trust Territory is unable to justify these changes with any factual support.

Also demonstrating the absence of the necessary correlation between the scales and the goal of recruiting needed labor is the basic design of the pay differentials themselves. The goal of recruiting skilled labor from outside the Territory is not furthered by paying a "market differential" based on prevailing wages other than those of the country from where the employee is recruited. Citizenship is for the most part irrelevant except as a general indicator of the probable country of recruitment. However, the point of recruitment is readily identifiable, thus eliminating the need to determine probabilities based on citizenship. Thus, the use of citizenship fails in dramatic fashion to meet the desired goals. The classification can be expected to attract United States citizens from any labor market, but will not attract others who are employed in a market with higher prevailing wages than those of his or her home country. The offensiveness of the classification

is further exemplified by the definitional change in the term "United States citizen." In P.L. No. 6-65, a "United States citizen" was defined to include "a citizen, permanent resident, or national of the United States." P.L. No. 6-65, Section 3(13). Executive Order No. 119 redefines "United States citizens" to include only those "citizens eligible for a United States passport." The Director of Personnel describes this change as follows:

> "[T]he plan revises the definition of 'United States Citizen' to mean only bona fide United States citizens. United States permanent resident aliens, who were previously considered United States citizens, will no longer be considered as such by the new plan."

Memorandum from Director of Personnel to Administrator of Administrative Services (6/20/79)(S.14D). Whether an employee recruited from the United States is a citizen or a "permanent resident alien" should be of no consequence if the actual goal is the stated goal of providing recruitment incentives. The Trust Territory's justification shows considerable weakness.

The Trust Territory's justifications are also inadequate in their failure to prove the unavailability of less restrictive alternatives. Of some weight is Trust Territory's failure to demonstrate to the satisfaction of this Court that an intermediate wage at which all workers would be paid was not feasible. Under the plan drafted by the Trust Territory Administration and its consultants, and enacted as P.L. No. 6-65, United States citizen employees were paid a differential which

658

matched or exceeded those add-ons established by the 1973 Salary Act.[93] The market place differentials were calculated to bring the salaries in parity with the United States salaries. In addition, United States citizens received free housing and utilities, which resulted in income greater than their mainland counterparts. The Trust Territory has not shown that a reduction in expatriate salary would result in the inability to attract qualified labor. The great success of the Peace Corps program would indicate otherwise.[94] Also, the Trust Territory insists that setting a wage scale at American standards would be financially ruinous. They do not analyze, much less prove, that a single salary scale set between the United States rate and the base rate would be equally undesirable.

Perhaps more telling is the failure to adequately explain why proposed "phase-outs" of United States contract workers were never carried out. There was no shortage of counsel on this matter. The Government itself in 1973 stated its aim to phase out virtually all expatriate employment to alleviate the

---

[93] In calculating the market place differential, the Golightly consultants attempted to match for each pay level the differential established by the 1973 Salary Act. Where the differential was less, the employee was "adjusted" to the next higher Base Salary Step to compensate. 1975 Golightly Report, supra note 82, at 12.

[94] The Peace Corps was able to attract hundreds of volunteers to Micronesia in a short amount of time. At one point it is estimated there was one volunteer for every one hundred Micronesians. McHenry, supra note 71, at 27-28.

tensions caused by the discriminatory pay scales. Report of the United Nations Visiting Mission to the Trust Territory of the Pacific Islands 39 (1973).[95] Also in 1973, members of the Congress of Micronesia stated to the Administration their position that one method to equalize pay was to phase out expatriate workers and the accompanying pay differential. S.S.C.Rep. No. 5-88, supra note 24, at 491. To aid in the accomplishment of this objective, the Committee urged the administration to develop timetables and implement programs to train Micronesians to adequately move into the employee ranks. Id. Yet by 1976, the drafters of the Five-Year Indicative Development Plan[96] found that "[m]anpower is... one of Micronesia's greatest under-utilized resources" and found further that the "lack of an educational [program] appears to be one of the major causes." Five-Year Development Plan at 37. The Report concluded that "in the future, positive job development programs and extensive training are needed." Id. at 9. Again, a Committee of the Congress of Micronesia communicated its desire that there be effectuated as quickly as possible a transition to an all-Micronesian workforce. Thus, it provided that the market

---

[95] The visiting mission included in its Report its satisfaction with the "considerable progress" which had been made in replacing expatriate employees with Micronesians. Unfortunately, this trend did not continue throughout the decade but was in fact reversed. See infra, pp.60-61.

[96] Supra note 20.

place differentials of P.L. No. 6-65 expire in one year. H.S.C. Rep.No. 6-120, 6th Cong. of Micronesia, 1st Reg.Sess. 618 (1975) (S.D.5). Again in 1977, the Administration's own consultant advised the Government to shift away from reliance on expatriate labor. 1975 Golightly Report, supra note 82, at 16.

Despite the constant attention given the subject, the administration did not trim down its ratio of expatriate employees to any considerable extent. From 1970 to 1977 the percentage of Trust Territory citizens employed on a Territory-wide basis rose from 89.3%[97] to 93.2%[98], while the percentage of United States contract personnel dropped slightly from 5.4% in 1970 to 5.2% in 1977. Of concern here are the actions in the Northern Marianas after January, 1978. Rather than a phase-out which would eliminate any reason, justifiable or not, for

---

[97] Based on figures from EMS Report, supra note 21:

| | | |
|---|---|---|
| Trust Territory citizens | 5,000 | |
| U.S. citizen-contract | 300 | |
| (U.S. Civil Service) | (300) | (not included in percentage calculation) |
| Total | 5,600 | |

[98] Based on figures from Golightly & Co., Summary Report: Plan for Salary Act and Recommendations (1977)(S.D.10)(1977 Golightly Report):

| | |
|---|---|
| Trust Territory citizens | 6,679 |
| U.S. citizen-contract | 282 |
| Others | 88 |
| Total | 7,049 |

separate pay scales, there was a relative _increase_ in United States citizen employees. The percentage figures are as follows:

| Year | T.T. Citizen % | U.S. Citizen % |
|------|----------------|----------------|
| 1978 | 76.5 | 19.5 |
| 1979 | 75.5 | 20.0 |
| 1980 | 69.4 | 22.3 |
| 1981 | 66.2 | 23.3 |
| 1982 (Jan.) | 60.8 | 28.0 |
| 1982 (Nov.) | 58.8 | 29.4 |
| 1984 | 61.3 | 28.8 [99] |

Thus, while there was a reduction in total personnel employed at the Headquarters, the Trust Territory did not "phase out" expatriate employees at a greater rate.[100] Available alternatives suggested by the Trust Territory government itself were not successfully enacted nor is there sufficient evidence to believe that a good-faith attempt at its implementation was made.

The Trust Territory's attempts to justify the use of

---

[99] Based on the following figures from Stipulation of fact No. 11:

| Date | Total HQ Emp. | T.T. Citizens | U.S. Citizens | Others |
|------|---------------|---------------|---------------|--------|
| 1/1/78 | 740 | 566 | 144 | 30 |
| 1/1/79 | 652 | 492 | 131 | 29 |
| 1/1/80 | 484 | 336 | 111 | 37 |
| 1/1/81 | 390 | 258 | 91 | 41 |
| 1/1/82 | 314 | 191 | 88 | 35 |
| 11/31/82 | 228 | 134 | 67 | 27 |
| 11/6/84 | 160 | 98 | 46 | 16 |

[100] The Trust Territory attempts to use these figures to demonstrate their good-faith phase-out efforts by highlighting only the U.S. citizen statistics which show a 98 person decrease. Brief in Support of TTPI Defendants' Motion for Summary Judgment 11. The percentage calculations demonstrate the fallacy of this assertion.

the suspect pay scales have not convinced this Court that the challenged compensation plans were necessary to achieve what could be characterized as of sufficiently compelling interest. The Court is unconvinced that the wage disparity was necessary to attract qualified skilled labor to the Trust Territory. Even if the Trust Territory were persuasive on this element, the scales as drawn are not sufficiently tailored to serve the stated purpose while minimizing the adverse impacts. The scales do not adequately work to compensate employees at the wages of their country of recruitment, but instead compensate at the market rate of the country of citizenship. The relevance of this plan has not been proven and indeed the Trust Territory has not attempted to so prove, relying instead on the point-of-recruitment theory. This discrepancy is perhaps most dramatically demonstrated b the liberal local-hire pay scales. Also, the Court is of the opinion that less drastic means were not actively pursued. Although aware of a "phase-down" option, and even though such an option was expressly endorsed, the relative size of the United States citizen work force remained relatively constant from 1970 to 1977 and on the headquarter level actually increased from 1978 to 1984. Nor is the Court satisfied that a new equitable salary schedule adopted in 1978 would have had the deleterious financial and social effects which the Trust Territory feared. The Trust Territory has not met its burden of demonstrating to this Court that the plaintiffs' rights to equal protection of the laws have not been denied.

## B. Disproportionate Impact

The conclusion reached regarding the unconstitutionality of the wage scales as promulgated and perpetuated by the Trust Territory administration is dispositive of the equal protection claim and entitles plaintiffs to remedial relief. Unfortunately, the equal protection doctrine is still in an early stage of development relative to other constitutional principles.[101] Thus, the many principles which together comprise the doctrine of equal protection are far from settled. A unique factual setting such as that presented by these motions is subject to widely divergent legal interpretations as the parties' memoranda indicate. Here, the parties differ as to the proper characterization of the classification at issue and as to the proper standard of review. The Trust Territory argues that the wage scales are permissibly based on citizenship, making judicial deference appropriate absent a showing of discriminatory intent.

The concept of discriminatory intent is a relatively recent development in equal protection analysis, first finding its place in Supreme Court jurisprudence in Washington vs. Davis,

---

[101] See, e.g., G. Gunther, The Supreme Court, 1971 Term-Forward, 86 Harv.L.Rev. 1, 8 (1972)("In the beginning of the 1960's, judicial intervention under the banner of equal protection was virtually unknown outside racial discrimination cases."); M. Phillips, Neutrality and Purposiveness in the Application of Strict Scrutiny to Racial Classifications, 55 Temple L.Q. 317, 324 (1982).

426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Under more traditional doctrine, "[t]he central prohibition of the equal protection clause is directed against the government's deliberate use of race as a criterion of selection." M. Perry, The Disproportionate Impact Theory of Racial Discrimination, 125 U.Penn.L.Rev. 540, 548 (1977)(Perry). A law which seeks a goal that is not race-related will nonetheless be subject to strict scrutiny if it is based on racial or like characteristics. Perry, at 549. Two reasons support this approach.

In the first instance, the Supreme Court has demanded substantial justifications for the use of such criteria because these laws "are precisely the kind of laws that are most likely to have resulted from animus, or prejudice, or the arbitrary discounting of individuals or groups." J. Clark, Legislative Motivation and Fundamental Rights in Constitutional Law, 15 S.D. L.Rev. 953, 969-970 (1978)(Clark). However, presumptions of intentional discrimination are not the only reasons suspect classifications trigger strict scrutiny. The very use of race or like criteria is disfavored "because of its tendency to foster race consciousness, to ingrain stereotypical thinking, and to cause competition and even hostility among racial groups." S. Bice, Motivational Analysis as a Complete Explanation of the Justification Process, 15 S.D.L.Rev. 1131, 1134 (1978). Thus, the Supreme Court has subjected to close judicial review all classifications which facially delineate on the basis of race, national origin, or other like criteria whether or not there has

been proof of a discriminatory intent or purpose.[102/]

The Supreme Court in Washington v. Davis addressed a challenge to an employment test which was facially neutral but which in effect disqualified four times more black than white applicants. Rejecting the plaintiffs' calls for strict scrutiny, the Court concluded that disproportionate impact, "[s]tanding alone... does not trigger the rule... that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations." 96 S.Ct. at 2049. In addition there must be an intent or purpose to discriminate. It is under this newer element of equal protection jurisprudence that the Trust Territory urges that plaintiffs' claims be considered.

Although the Court remains convinced that the actions herein complained of transcend the bounds of equal protection on the basis of their unjustified use of suspect criteria, the Court also finds evidence of intentional discrimination. Accordingly, as an alternative basis for its judgment, the Court relies on the plaintiffs' demonstration of impermissible intent as set forth in the following disproportionate impact analysis.[103/]

---

[102/] Consider the Bakke and other opinions wherein the Supreme Court rejected rational basis review of allegedly benign classifications. See supra pp.31-32.

[103/] A similar resort to alternative legal theories was used by Chief Judge Peckham of the Northern District of California in Larry P. v. Riles, 495 F.Supp. 926, 974 (N.D.Cal. 1979).

### 1. Employees' Burden

As stated above, it is now settled that a facially neutral statute or regulation which disproportionately disadvantages a suspect or less than suspect class of persons or which infringes upon a fundamental right or important interest will not, standing alone, be found violative of the equal protection clause. Washington v. Davis, supra; Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Equal Protection Clause prohibits only invidious discrimination. Washington v. Davis, 96 S.Ct. at 2047. Thus, to succeed on his or her claim, a plaintiff must prove that the disproportionate effect is the result of "racially discriminatory purpose" or intent. Washington v. Davis, 96 S.Ct. at 2047-2048. The burden rests with the challenger to show that the government action was taken to some extent "because of" the adverse impact and not just "in spite" of it. Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). However, the plaintiff need not demonstrate that an unlawful intent was the sole purpose of the action; rather, it must be shown to have

---

Judge Peckham, although having decided the case on statutory principles, nevertheless opted to address the constitutional claims due to the uncertainty of Title VI judicial review in the wake of Bakke.

been a substantial or motivating factor. <u>Village of Arlington Heights</u>, 97 S.Ct. at 563 and n.21; <u>Hunter v. Underwood</u>, __ U.S. __, 105 S.Ct. 1916, 1919, L.Ed.2d 222 (1985). Put another way, there must be a showing that a discriminatory purpose has in some way "shaped" the action. <u>Feeney</u>, 99 S.Ct. at 2294.

As an initial matter, it cannot be disputed that the use of the challenged wage scales disproportionately affects Micronesians.[104]/ As noted above, the employee class defined as "Trust Territory citizens" is composed entirely of Micronesians. Nor does this Court hesitate in finding that the class of Micronesians is a class defined by ancestry or ethnic origin[105]/ and as such is a "suspect" class deserving of heightened judicial scrutiny. <u>See Hirobayashi v. United States</u>, 370 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1946)(distinctions between persons solely because of their ancestry "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.")

The burden which the Supreme Court has placed upon challengers of adverse impacts is not one lightly taken; proof of

_____

104/ The Trust Territory concedes that Micronesians are adversely affected by the pay scales. Trust Territory Opening Brief at 20.

105/ See, supra note 63 for stipulated definition of "Micronesian."

discriminatory purpose "is often a problematic undertaking." Hunter v. Underwood, 105 S.Ct. at 1920. Rarely is there direct evidence of impermissible motive. Where the action is taken by only one official, it will be couched generally in lawful, non-discriminatory terms. Where the action of a legislature or other group of government representatives is challenged, motive is difficult to determine because legislatures or other groups of policy-makers do not act with a single purpose or intent. Arlington Heights, 97 S.Ct. at 563. Rather, purpose and intent must be determined from the "cumulative impact of the evidence." Diaz v. San Jose Unified School District, 733 F.2d 660, 674 (9th Cir. 1984)(en banc), cert. denied, __ U.S. __, 105 S.Ct. 2140 (1985).

Disproportionate impact, however, is by no means irrelevant and "may provide an important starting point." Arlington Heights, 97 S.Ct. at 564. The adverse impact, as noted above, is clear. How does this aid in the proof of intent?

The Supreme Court has declined to adopt the tort law analysis that one intends· the natural and foreseeable consequences of his or her acts. "[D]isparate impact and foreseeable consequences, without more, do not establish a constitutional violation." Columbus Board of Education v. Penick, 443 U.S. 449, 464, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979). Nevertheless, "actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose." Id. In situations where the

disproportionate impact is as inevitable as the burdens placed on Micronesians under the wage scales, the Supreme Court has recognized that "a strong inference that the adverse effects were desired can reasonably be drawn." Personnel Administrator v. Feeney, supra, 99 S.Ct. at 2296 n.25. While the inference alone is not a "synonym for proof", it is useful as a "working tool." Id. In addition to the foreseeability of the adverse impacts of the wage scale, there is ample evidence to demonstrate the Trust Territory's awareness of the consequences.

The Trust Territory does not dispute that the compensation plans had a severely disproportionate impact on Micronesian employees. The ethnic homogeneity of the class of Trust Territory citizens amply supports the foreseeability of the adverse impact on Micronesians. The administration admits that the pay plans were promulgated "knowingly and intentionally, and not by accident or mistake." S.F.33. Furthermore, its own records, produced in response to discovery requests, reveal that the employee class compensated under Schedule I consists almost exclusively of Micronesians. Nor can the administration feign unawareness of the social consequences of the compensation plan. In 1969, the Trust Territory Department of Education, reporting on the existing compensation practices and proposing a "single salary schedule for Education employees" drew attention to the discriminatory pay practices and warned that "dissatisfaction and feeling of inequitable treatment does not foster a satisfied [employee]." DOE Report supra note 20, at "Conclusions." Perhaps

670

most importantly, the Trust Territory government was made aware of the painful consequences of the discriminatory action by the employees themselves. See Responses of Defendant Trust Territory of the Pacific Islands to Plaintiffs' Second Set of Interrogatories 9-13. One employee, Justin Manglona, made several complaints to the High Commissioner and United States officials arguing that the continued application of the discriminatory wage scales results in a loss of trust and respect in the government.[106] After receiving no response, Mr. Manglona again wrote the High Commissioner complaining of the discrimination and unfair treatment which had resulted in feelings of inferiority.[107] The practices, he charged, were "demeaning and morally wrong," and caused humiliation resulting in loss of "morale, efficency, honesty and trust."[108]

The historical background of the challenged action may also be useful in determining discriminatory intent "particularly if it reveals a series of official actions taken for invidious purposes." Arlington Heights, 97 S.Ct. at 564. The actions of the United States regarding policy in Micronesia is probative for

---

[106] Letter of June 26, 1979 from J. Manglona to High Commissioner (appended to affidavit of J. Manglona in support of Opposition to Motion to Dismiss).

[107] Letter of November 23, 1979 from J. Manglona to High Commissioner. See note 106 supra.

[108] See note 106 supra.

several reasons. As will be discussed below, the evidence shows a pattern of invidious official action which placed Micronesians in a secondary, inferior class; the evidence reveals an intent to treat Micronesians with disfavor to advance the United States to a superior position. This pattern of historical discrimination is relevant not only in its own right, but to uncover the attitudes of the Trust Territory administration. As noted above, the Trust Territory was merely a conduit through which to implement United States policy in Micronesia. The High Commissioner was appointed by the Interior Secretary, and later by the President, and was answerable to them. Accordingly, it is not unreasonable to examine the United States' attitudes and policy decisions in order to understand the underpinnings of Trust Territory governmental action.

The United States has, in general, been relatively candid in its admissions that its policy regarding Micronesia is founded primarily on its perceived national security needs. The United States' drafted Trusteeship Agreement[109] established the world's only strategic trusteeship by giving the United States full authority to "establish naval, military and air bases"[110] and to close from time to time areas of the Territory for security reasons.[111] The debates of the Security Council demon-

---

[109] See Temengil I, 33 FEP Cases at 1032.

[110] Trusteeship Agreement Article 5.

[111] Trusteeship Agreement Article 13.

672

strate the purposes of the United States in acquiring the Territory. Upon presentation of the draft Agreement, Mr. Austin, the United States Representative to the United Nations, noted that the islands constitute "an integrated strategic physical complex vital to the security of the United States."[112] and that "in such an area the security objective must be an overriding consideration."[113] This attitude was expounded at the Congressional hearings on the Agreement. Chief of Staff Dwight D. Eisenhower assured the members of the Senate Committee on Foreign Relations that, in view of the area's necessity to the security of the United States, the agreement was drafted to "give us all the national security rights and... permissive functions that we need."[114] Likewise, the Secretary of State reassured the Senate Committee that under the Agreement, the United States maintains "the same freedom of action as [it] would have... under [the] present exclusive control."[115] In response to further questioning, Secretary of State Marshall dispelled any confusion

---

[112] U.N. SCOR 407 (1947), reprinted in Note, Self-Determination, supra note 69, at 390.

[113] U.N. SCOR at 409, Note, Self-Determination supra note 70 at 390.

[114] Hearings on S.J. Res. 143 Before the Senate Comm. on Foreign Relations, 80th Cong., 1st Sess. at 18, reprinted in Note, Self-Determination, supra note 70, at 390 n.44 ("Hearing").

[115] Id., Hearings at 5, Note, Self-Determination, supra note 70, at 390 n.45.

regarding priorities between rights of the inhabitants and national security interests by assuring the Committee that there was nothing in the agreement regarding the rights of the peoples of the Trust Territory which would in any way hamper the United States' defense control.[116/] The Congress and the Security Council approved the Agreement, giving the United States plenary military authority over the area.

Perhaps most revealing regarding the attitude of the United States are the actions taken by the Kennedy and Johnson administrations in the 1960's. The policies of these administrations are reflected in the report of Anthony Solomon's Visiting Mission to the Trust Territory which was conducted in response to National Agency Security Memorandum No. 145.[117/] The report

---

[116/] Id., Hearings, supra note 114, at 6, Self-Determination, supra note 70, at 390 n.47.

[117/] The Court takes judicial notice of the "Solomon Report". Generally, "a district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial." St. Louis Baptist Temple v. F.D.I.C., 605 F.2d 1169, 1171-1172 (10th Cir. 1979); see 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure §2723 (1983); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Procedure ¶56.11 [1-7]; 9 Wigmore on Evidence §2571 (Chadbourn Rev. 1981). Judicial notice may be taken of documents and other forms of evidence even though not introduced by the parties. St. Louis Baptist Temple, 605 F.2d at 1172; Sierra Club v. Morton, 400 F.Supp. 610, 633 (N.D.Cal. 1975), rev'd on other grounds, 610 F.2d 581 (9th Cir. 1979), rev'd, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). Specifically, courts have taken notice of administrative reports, memoranda and other public documents. See Interstate Natural Gas Co. v. Southern California Gas Co., 209 F.2d 380, 385 (9th Cir. 1953)(Federal Power Commission

674

recognized that Micronesia was "essential to the U.S. for security reasons" and sought to find a resolution to the conflicting interests presented by the perceived security needs on one hand and international presssure to settle the status of Micronesia in the best interests of the inhabitants on the other.[118/] The report concluded that as the United States could not "give the area up,"[119/] it would have to make Micronesia United States territory. In order to achieve this goal while maintaining the semblance of self-determination necessary to satisfy international critics, the Mission concluded that there should be a plebiscite which the United States should insure will result in a vote for a permanent relationship.[120/] "Winning the plebiscite and making Micronesia United States territory" could be accomplished by the initiation of an intensive capital invest-

_____

report); Tempel vs. United States, 248 U.S. 121, 130, 39 S.Ct. 56, 59, 63 L.Ed. 162 (1918)(Supreme Court takes judicial notice of reports of Secretary of War to 'amplify' findings of fact); see also, United States v. Camp, 723 F.2d 741, 744 note (9th Cir. 1984) (collecting cases where court took judicial notice of documents which were public records). The Solomon Report is an official report commissioned by the White House and is reprinted in McHenry, supra note 71, at Appendix I; McHenry's work is available at public libraries. See Sierra Club v. Morton, supra (district court took judicial notice of Senate document which it obtained at the public library).

118/ McHenry, supra note 116, at 231.

119/ Ibid.

120/ Ibid. at 233.

675

ment program which would flood the islands with United States money and give the Micronesians "a sense of progress to replace the deadly feeling of economic dormancy."[121]/ The Mission suggested that the plebiscite be held in 1968 since it believed that the

> "maximum impact of the recommended capital investment program will not be felt until late 1967 on the one hand, nor will it be felt as strongly after 1968, since the Mission does not expect the development process in the private sector of the Micronesian economy to be strong enough to offset the anticipated cutback in the capital investment program after fiscal year 1968."[122]/

The goal of selling annexation to the Micronesians would be aided by other actions which would "facilitate the general development of Micronesia[n] interest in, and loyalties to, the U.S." such as sponsorship of leader visits to the United States, introduction of "U.S.-oriented curriculum changes" and "patriotic rituals" into the schools, and acceleration of college scholarship programs.[123]/

The security-oriented goals never lost the sight of the Mission, however. The intensive capital investment program was considered "strategic rental,"[124]/ which could be reduced follow-

---

[121]/ Ibid. at 223, 235.

[122]/ Id. at 236-237.

[123]/ Id. at 238.

[124]/ Id. at 233.

676

ing a "favorable" plebiscite.[125/] The United States could keep close watch on the political activities of the inhabitants while developing interest in permanent affiliation through the use of "information officers" who would supply information to Micronesians as well as perform "the regular political reporting function."[126/] Also, while recognizing that the inhabitants would desire some form of self-government, the Mission cautioned against losing security control. A "reasonable appearance of self-government" could be given by allowing an elected legislature and a legislatively appointed chief executive, while at the same time retaining "adequate control" through an appointed High Commissioner.[127/] The authority of the High Commissioner would include at a minimum the authority to withhold all funds and to declare martial law[128/] and the "maximum additional power of vetoing all laws, confirming the Chief Executive's appointments of key department directors and dismissing the Chief Executive and dissolving the legislature at any time."[129]

---

[125/] Ibid at 235.

[126/] Id. at 237.

[127/] Id. at 238.

[128/] Id. at 238. The powers of martial law would include the authority to "assume all legislative and executive powers when the security of the US so requires."

[129/] Id. at 239.

Interestingly, the Mission detected the simmering resentment of the people toward the "high salaries for U.S. personnel in Micronesia."[130] In response, the Mission suggested that promises be made to the wage earners that upon agreeing on a new status "Micronesian and U.S. personnel basic pay scales would be equalized."[131]

The candid analysis of United States' policy embodied in the Solomon Report become, in the words of one commentator. the "blueprint" for Micronesia followed by the Kennedy and Johnson administrations. Note, Self-Determination, supra note 70 at 284 n.45.[132]

The historical background assists in attempting to decipher the intent and purpose of the Trust Territory government's personnel actions in the 1970's. The historical policy actions taken and the general attitude of the government toward the complaining class must be reviewed in light of the legislative history and the events surrounding the challenged action. Arlington Heights, 97 S.Ct. at 564-565.

---

[130] Id. at 235.

[131] Id. at 238. The commission concluded that the costs of such a plan would not be excessive.

[132] The statistics of the period bear out this conclusion. In 1961 the budget of the Trust Territory was increased from $7.5 million to $17.5 million and continued to escalate through the 1960's reaching $60 million in 1971. Metelski. supra note 76, at 166 n.20.

The impetus to develop equitable wage scales came from officials of the United States who urged that policy changes be made to eliminate divergent pay scales and to equalize wages. On his visit to Micronesia in 1969, Interior Secretary Hickel, in an address to the people, made known the Nixon administration's pledge to Micronesia:

> "you will be brought into the planning and decision processes as full and equal partici-pants with American personnel. To accelerate this process, I have directed the High Commissioner to start within 90 days an active and imaginative program of training of Micronesians for positions of greater responsibility in the Administration. Every effort will be made to eliminate any differ-ence which may exist in pay schedules. We look forward to the day when we can proudly say that we provide for persons with equal qualifications, equal pay for equal work throughout the Trust Territory Govern-ment."133/

Adopting the Secretary's stated objectives on behalf of the Trust Territory Government was then High Commissioner Edward Johnson who told the Micronesian people:

> "The keynote of our program will be the ever-increasing involvement of the Micronesian people in their own government. Greater emphasis than ever before will be placed on a Micronesian Training Program reaching every level of every branch of the Trust Territory

---

133/ Secretary Hickel's statement is taken from Issue Support Paper No. 72-65-1 of the Department of the Interior, which is available in the Trust Territory Archives. The Court takes judicial notice of the document. See note 117, supra. The statement is also reprinted in part in two of the Stipulated Documents. See DOE Report, supra note 20; EMI Report, supra note 21, at I.

679

Government. We must fully realize that as Micronesians prepare themselves eventually to occupy every position in their government, there must be an equalization of the American and Micronesian pay scales in the Trust Territory.134/ (Emphasis added).

The encouraging statements of the two officials were received with appreciation and were followed by immediate responses by people in the Trust Territory.

The Trust Territory Department of Education was one of the first to act, interpreting Secretary's Hickel's statement as a "mandate... to proceed toward the accomplishment of [equality of pay]." DOE Report, supra note 20 at "Origin of Study." A special committee composed to study Department of Education's compensation policy proposed a plan to provide take-home pay equity among United States and Micronesian employees. In the following year, H.B. 57 was introduced in the Congress of Micronesia proposing a single salary plan.135/ The bill was tabled at the request of the administration which asked that any action on personnel administration await the report of its consultant, Employee Management Service, Inc. (EMSI) which the administration planned to follow.136/

---

134/ High Commissioner Johnson's address is reprinted in DOE Report, supra note 20 at "Conclusions."

135/ S.S.C.Rep. No. 4-26, 4th Cong. of Micronesia, 4th Special Sess. 154-166 (1971). The Court takes judicial notice of the report. See note 117 supra.

136/ Ibid. at 155.

Before the Fourth Congress convened, EMSI released its report. The report was undertaken only upon the consultants' belief in the sincerity of the High Commissioner's pledge to equalize wage scales in the Trust Territory. EMS Report, supra note 21, at 1. Finding, as did the Department of Education, the tripartite compensation practices then in effect to be discriminatory, the report proposed a single pay schedule with income tax and relocation add-ons for employees from the United States. EMSI Report, supra, at 29.[137]

Contrary to his indications to the Congress of Micronesia, the High Commissioner did not adopt the recommendations of the EMSI Report. Instead, he enacted new pay scales which set the pay of contract personnel to approximately the wage earned by Civil Service employees. It was estimated that this resulted in a greater pay discrepancy, and set United States personnel salaries at a rate 50% to 300% higher than that proposed by EMSI. S.S.C.Rep. No. 4-26, supra note 135, at 155. Additionally, the High Commissioner adopted a local-hire pay plan allowing local

---

[137] The perceived need for a tax-differential was based on the federal tax obligations imposed on United States citizens which obligations were not applicable to the incomes of Micronesian employees. The add-on was proposed to off-set the tax burden and achieve pay parity. The size of the differential was arrived at from estimated tax calculations. The relocation differential was adopted from the existing system which allowed a differential for any employee who was assigned to a duty post other than his home district or country. The relocation differential was available to United States citizens and Micronesians alike.

hire United States citizens 80% of the standard United States differential. Public Administration Service, Report on a Review of Salary Administration in the Executive Branch of the Trust Territory Government 2-3 (1972)(PAS Report).

Not surprisingly, the members of the Congress of Micronesia were outraged.[138]/ Not only did the High Commissioner fail to develop a single salary plan along the lines of Secretary Hickel's pledge, as requested by the Congress and as promised by the High Commissioner,[139]/ High Commissioner Johnson did not even adopt the advice of his own consultants. Worse, he further increased the existing discrepancies in the pay gap between the United States and Trust Territory citizens, all without the knowledge, much less the consent of the Congress.[140]/ The Congress took two actions to demonstrate its disapproval of the Commissioner's actions. The Senate passed Senate Joint Resolution No. 26 on March 17, 1971, requesting the Secretary of the Interior to consider replacing the High Commissioner with

---

[138]/ See generally S.S.C.Rep. No. 4-26, supra note 135.

[139]/ Ibid. at 155. The Committee alleges that the High Commissioner allowed the Congress to believe that if H.B. 57 were tabled, an equitable pay plan would be developed. Further, there is evidence that the High Commissioner testified before the United States Congress to the effect that a single salary plan would soon be implemented along the lines of Secretary Hickel's pledge. [92nd Cong., 1st Sess. House Comm. 783-786-789].

[140]/ Ibid.

an Executive Council.[141]/ More importantly, H.B. 57 was reintroduced and was enacted by both chambers.[142]/

H.B. 57, as reintroduced, inter alia, mandated the High Commissioner to develop a single scale pay plan by April 1972; in the interim, the EMSI proposals would take effect. On July 10, 1971, the High Commissioner vetoed H.B. 57.[143]/ The High Commissioner cited as necessitating the veto a section which attempted to eliminate Civil Service employees, which he contended the Congress of Micronesia was without authority to do.[144]/ However, the majority of the veto message focused on the undesirability of a unitary compensation plan. In addition, the High Commissioner reaffirmed the pay schedules adopted as of April 1, 1971.[145]/

---

[141]/ See S.S.C.Rep.No. 4-10, 4th Cong.of Micronesia, 4th Special Session (1971).

[142]/ The Senate passed the bill on May 21, 1971. Senate Journal, 4th Cong.of Micronesia, 4th Special Sess. 97(1971) (Senate Journal). The bill was apparently adopted by the House as H.B. 57 and was sent to the Conference Committee. C.C.Rep. No. 2, 4th Cong.of Micronesia, 4th Special Sess. 168 (1971). The Conference Committee amendments apparently were approved and included in H.B. 57, since the High Commissioner saw it necessary to exercise his veto authority.

[143]/ High Commissioner Communication No. 18 (7/10/71), reprinted in Senate Journal, supra note 142, at 170-171.

[144]/ Interestingly, the High Commissioner chose not to exercise a line item veto.

[145]/ The Congress responded with a Joint Resolution requesting the Secretary of the Interior to give the Congress override authority. S.J.R. 94, 4th Cong.2d Reg.Sess. 222 (1972).

The Fourth Congress returned to its Second Regular Session and enacted P.L. No. 4C-49. The law was important for two reasons. It allowed the High Commissioner to implement "one or more salary schedules"; and, second, it required that all salary schedcules be approved by the newly-created Trust Territory Personnel Board. All salary schedules were to be enacted into law by the Congress. The Trust Territory cites this and other Congressional action as demonstrative of Congressional approval of disparate pay scales, thereby negating any inference of discriminatory intent. The Committee Reports demonstrate the fallacy of this conclusion. The members of Congress made it clear that P.L. No. 4C-49 was no more than a reluctant compromise in light of the recognition that "a Single Salary Plan is unacceptable to the Administration." S.S.C.Rep. No. 4-123, 4th Cong.of Micronesia, 2nd Reg.Sess. 414-418 (1972). The Committee reaffirmed that its views "with respect to a single pay plan... have not changed." Id. at 414. The Committee continues:

> We still view the adoption of a single pay plan for all employees of the Trust Territory Government as essential. This is one area, however, on which the Administration has refused to compromise. Therefore, the bill gives the authority for the enactment of 'one or more salary schedules.'

Id.

At the end of 1972, the administration's pay scales were criticized by yet another consultant. Public Administration Services, commissioned to study the existing pay scales and propose modifications, found the administration's pay scales for

684

expatriate employees objectionable. Initially, PAS found it "almost impossible to defend a policy under which two employees, possessing equal qualifications and assigned to similar or identical jobs, are given pay levels on the sole basis of their nationality." PAS Report, supra p.81, at 8. The report noted that the concept of "equal pay for equal work" is "almost universally accepted in modern personnel administration." Id. Aside from the inherent inequity, the report found the pay practices regarding United States employees otherwise unjustifiably preferential. Establishing the wage scale based on Civil Service pay in order to attract qualified United States personnel was not necessary since civil service rates were generally higher than prevailing United States wage rates. Furthermore, the Trust Territory historically did not draw its employees from the federal schedule labor pool. PAS Report, at 20-21. Thus, their current pay practices were excessive.

Also objectionable was the administration's local-hire pay plan which compensated local-hire and third country nationals at 80% of the United States schedule. This differential was "unjustifiably high" and was not supported by the government's assertions that differentials were needed to attract labor. Local-hire labor was already here. Moreover, because the pay scales did no more than set pay on the basis of color or national origin, they were termed "repugnant both from the moral and the legal points of view." PAS Report, at 21- 22. Also, regarding the 80% differential for third country nationals, the report

found that this was not based on pay surveys but was rather done for administrative convenience. Id. at 23. In conclusion, PAS proposed a market place differential plan with actual differentials determined by the prevailing wages of the country of recruitment. Local hires would be compensated at the Micronesian rate with special differentials added only in exceptional circumstances.

The Congress of Micronesia implemented many of the PAS recommendations in P.L. No. 5-59. The new schedule steered away from the federal wage rates and instead paid United States contract employees the base salary and a tax allowance, plus a recruitment allowance based on the prevailing wages of the country of recruitment. Importantly, the recruitment differential applied only to those expatriates recruited from abroad. Section 7(1); Section 8. The 80% local-hire differential was replaced by a nominal tax-relief allowance. The new salary plan was to expire within one year in order to give Congress an opportunity to review it after implementation.146/

The enactment of P.L. No. 6-65 demonstrates the administration's success at selling its position regarding local hires. Under P.L. No. 6-65, local hires are returned to the 80% differential; the Congress of Micronesia compromise appears as a two-year limit on the differential.

146/ S.S.C.Rep. No. 5-88, supra note 24, at 453. 5th Cong. 1st Sess. (1973) at 453.

Despite concerns raised throughout the 1970's about pay equity, the administration proposed legislation to the Seventh Congress which perpetuated the divergent pay scales. H.B. 7-403, *supra* note 85. Eliminating the system of differentials, H.B. 7-403 sought to establish two separate pay scales, one for United States citizens and one for Trust Territory citizens. The feature most indicative of the administration's intent was the inclusion of a local-hire wage scale equivalent to that of expatriates recruited abroad. H.B. 7-403, §6. Gone are the 'point of recruitment' justifications. H.B. 7-403 did not gain the approval of the Congress of Micronesia. Instead, P.L. No. 6-65 was continued in effect by legislation and, upon the dissolution of the Congress, by Executive Order. See *supra* pp.11-13.

The capstone of the administration's efforts to segregate absolutely the Micronesians and United States citizens is Executive Order No. 119. Already discussed above, the terms of the Order need not be extensively reviewed here. Executive Order No. 119 established a tripartite wage scale. Despite the constant battles over local hires, once the High Commissioner again had unfettered authority, local hire United States citizens were paid at the same rate as expatriates recruited from abroad.[147/] Also gone was the flexibility in differentials for

_____

[147/] The Bureau of Personnel portrayed the administration's justification of the uniform pay scales for United States

third country nationals. Discussed above was the inability of this new plan to meet the administrations's stated needs. This equalization of pay along with the rigidity of the other aspects of the system aptly demonstrates the administration's insistence of paying United States employees a higher rate than Micronesians.

There is more than sufficient evidence to demonstrate that the Trust Territory administration, by failing to take remedial action on and after January 9, 1978 regarding the discriminatory pay practices and by promulgating Executive Order No. 119, was acting with the purpose and intent of offering preferential compensation plans to United States citizens over equally qualified Micronesians. The intent to discriminate does not necessarily mean an intent to harm Micronesians. See _Larry P. v. Riles_, 495 F.Supp. 926, 979 (N.D.Cal. 1979)(Even a "well meaning intention to adopt and retain procedures" which have a segregative effect found violative of equal protection). The

---

prime and local hires, as a desire to eliminate discrimination among the two groups. "The allegation that the current TT Headquarters pay plan discriminates on the basis of race is not valid," the report states. Rather, the Bureau of Personnel asserts that the pay practices were guided by the principle of "equal pay for equal work." Accordingly, the report continues, "the current... pay plan treats all employees in the same category of citizenship, whether recruited locally or from abroad, equally in terms of basic pay." Bureau of Personnel, Memorandum: Review of Trust Territory Headquarters Pay Administration Practices 3 (1980). S.D.16.

prohibition against discriminatory action is a command for "purity of motive." Not only are motives of hostility and vengeance forbidden but, alternatively, so are goals of partiality and favoritism. Clark, supra p.64, at 964 (quoting Tussman & TenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341, 358 (1949)). The history of the pay scales reveals a series of frustrated attempts to achieve pay equity: the failure by the administration to carry out its own pledges, the refusal to adopt alternative pay plans with less discriminatory impact, and the implementation of a grossly disproportionate wage schedule which afforded preferential treatment to United States citizens qua United States citizens. Together these actions satisfy this Court that a prima facie case of intentional discrimination is presented.

### 2. Trust Territory's Justifications

The burden now shifts to the Trust Territory to "rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972)). Put another way, "the presumption of intentional discrimination becomes proof unless the defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies." Oliver v. Michigan State

Board of Education, 508 F.2d 178, 182 (6th Cir. 1974), cert. denied, 421 U.S. 963 (1975). The matter is one of causation. The Trust Territory must now prove that "the same decision would have resulted even had the impermissible purpose not been considered." Arlington, supra, 97 S.Ct. at 566 n.21.

In reviewing the Trust Territory's justifications, this Court will not accept allegations of a mere rational basis. Upon a prima facie showing of discrimination, "judicial deference is no longer justified." Arlington, 97 S.Ct. at 563. The government's justifications will be subject to the strictest scrutiny and are justifiable only by the weightiest of considerations. Davis, 96 S.Ct. at 2049. The rule that a law or other government action which classifies on national origin requires an extraordinary justification "applies as well to a classification that is ostensibly neutral but is an obvious pretext for... discrimination." Feeney, supra, 99 S.Ct. at 2292. The Second Circuit has well-stated the burden shift in the context of school segregation:

> The burden of proof then shifts to the defendant officials to show that the pattern of actions taken by those officials can be explained in a manner consistent with the absence of segregative intent. Put differently, once the burden of proof has shifted, school officials must be able to demonstrate that no reasonable alternative policy would have achieved the same permissible educational goals with less segregative effect. When such a showing cannot be made, it is entirely reasonable to infer that the officials acted with unlawful segregative intent. [footnote omitted]

Arthur v. Nyquist, 573 F.2d at 142-143 (2nd Cir. 1978), cert. denied, 439 U.S. 860 (1978).

The Trust Territory's justifications for the continued use of the disputed wage scales have been extensively reviewed in the previous section; that analysis applies equally as well here. The administration argues that the disproportionate and adverse impact on Micronesians is an unfortunate, undesirable, but unavoidable consequence of a policy necessary to promote the economic advancement of the Trust Territory inhabitants. As discussed above, however, the need for the continued employment of foreign, especially United States, personnel has not been sufficiently supported. The Trust Territory itself conceded years ago that a phase-down of non-Micronesian personnel was necessary for an eventual equalization of pay scales. Yet, from 1978 to the present, there has actually been a relative increase in United States employees at the Headquarters. See supra p.61. The Court is not convinced that there were no qualified Micronesian employees to staff the Headquarters, nor is it satisfied that implementation of the "innovative" training programs ordered by Secretary Hickel would not have provided the necessary manpower.

Moreover, even were a small staff of non-Micronesian personnel necessary, the Trust Territory has not persuaded the Court that the divergent pay scales were necessary to the recruitment of these employees. Not only is there no evidence that the administration would be unable to attract qualified

691

personnel at wages lower than were paid, there is evidence to the opposite effect. For instance, in the 1960's and early 1970's, the Trust Territory was in fact attracting experienced labor at rates less than the prevailing United States government wage at the time. See supra p.80 (wages of contract employees were raised to meet the U.S. Civil Service standard not because of difficulty in recruitment but to eliminate discrimination among United States employees). The success of the Peace Corps program lends support as well. See supra note 94. Nor is the Court convinced that as of 1978 the administration could not have equalized the pay scales without causing the "ruinous" economic results feared. Moreover, even in light of these "economic disaster" tales, the administration raised the compensation of local-hire United States citizens to a level commensurate with that earned by prime contract employees.

Not surprisingly, the Court concludes that the Trust Territory Government has failed to justify on permissible grounds its actions perpetuating and promulgating the tripartite wage scale. In light of the available alternatives which the government stubbornly refused to explore yet which had less discriminatory impact, the Trust Territory has failed to convincingly demonstrate that its activities were taken independent of discriminatory intent. The inference that such discriminatory intent led to the challenged actions regarding compensation plans is compelling. The Trust Territory government's actions on and after January 9, 1978 were taken in violation of

692

the principles embodied in the Equal Protection Clause of the Fourteenth Amendment entitling the plaintiffs to a remedy pursuant to 42 U.S.C. §1983.

## IV. Trust Territory Bill of Rights

1 T.T.C. §7 provides:

> Discrimination on account of race, sex, language or religion. No law shall be enacted in the Trust Territory which discriminates against any person on account of race, sex, language or religion; nor shall the equal protection of the laws be denied.

At a minimum, the equal protection clause of the Trust Territory Code prohibits conduct which violates principles of equal protection embodied in the United States Constitution. See, e.g., Di Stefano v. Di Stefano, 6 T.T.R. 312 (High Court 1973)(the interpretation and meaning of the clauses of the United States Constitution);[148]/ see, also, Temengil I, supra, 33 FEP at 1066. Thus, the conclusion reached above regarding the unconstitutionality of the challenged actions is dispositive of the claims raised under 1 T.T.C. §7. Accordingly, the Court concludes that the equal protection clause of the Trust Territory

---

[148]/ The Trust Territory Clause may well proscribe conduct permitted under the United States Constitution. Note for instance the express language regarding discrimination which is absent from the Fourteenth Amendment. Note also the Supreme Court's more lenient review of sex-based classifications. See Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

Bill of Rights has also been violated.

## V. Trusteeship Agreement Claims

 "The Trusteeship Agreement creates direct and affirmative rights which are judicially enforceable in federal courts." Temengil I, 33 FEP Cases 1035; People of Saipan v. Department of the Interior, 502 F.2d 90, 97 (9th Cir. 1974), cert. denied, 420 U.S. 1003. The Agreement created a fiduciary relationship between the United States and the people of the Trust Territory in which "the interests of the inhabitants of the territory become paramount." Liebowitz, supra note 9, at 79 n.236. Temengil v. Trust Territory, Civ.No. 81-0006 (Decision filed Feb. 4, 1985)(Temengil II); Temengil I, 33 FEP Cases at 1032. The terms and principles of the Agreement govern the conduct of the United States and the Trust Territory governments alike; each are subject to liability for the breach of duties and obligations created thereunder. Temengil I, 33 FEP Cases at 1044-1047.[149]/

 The duties imposed under the agreement are unprecedented in their "detail, precision and scope." Temengil I, 33 FEP Cases at 1035. Specifically, the covenants against discrimination encompassed by the Agreement are legion. See

---

[149]/ While the Trust Territory remains liable for monetary and injunctive relief, the monetary claims against the United States have been previously dismissed. Temengil I, 33 FEP Cases at 1047-1048.

694

generally Temengil II, slip op. at 26-29. The Agreement itself imposes upon the United States the obligation to "protect the rights and fundamental freedoms of all elements of the population without discrimination." Article 6(3). Also, the Charter of the United Nations, obedience to which is mandated by the Trusteeship Agreement,150/ commands the member nations to "take action for the achievement of universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race." Charter of the United Nations, Articles 55 and 56, reprinted in, Goodrich, Hambro and Simons, Charter of the United Nations: Commentary and Documents 371-382 (1969).

The contours and delineations of these covenants against discrimination are found in and derived from "relevant principles of international law... which have achieved a substantial degree of codification and consensus." People of Saipan, 502 F.2d at 99. This Court has previously held that "a well-recognized and leading document" which further defines such international principles is the Universal Declaration of Human Rights, Gen.Assembly Res. 217 A(III)(Dec. 10, 1948).151/ Article 23(2) of the Declaration provides:

---

150/ Trusteeship Agreement Article 4.

151/ The Declaration was adopted by the United States in 1948, within a year of the ratification of the Trusteeship Agreement. See Temengil II, slip op. at 28. "The United States has frequently reiterated its acceptance of the Universal Declaration, and whatever legal character it has would bind the United States." Restatement of the Law 2d,

695

> Everyone, without discrimination has the right to equal pay for equal work.

The rights of freedom from discrimination are further elaborated at Article 2:

> Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

Equal protection principles are embodied at Article 7 which provides:

> All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

---

Foreign Relations Law of the United States (6th tent. draft, Apr. 12, 1985), introductory note to Part VII, p.453. The Reporters' Note 4 to §701 of the Restatement (Human Rights Obligations under United Nations Charter) states that "the Charter, the Universal Declaration, other international resolutions and declarations... have combined to create a customary international law of human rights requiring every state to respect the rights set forth in the Declaration." Id. at 461. The Reporters' Note 5 to §701 (International Human Rights Standards as Source of U.S. Law) comments that"[c]ourts in the United States have increasingly looked to international human rights standards as law in the United States or as a guide to U.S. law." Id. p.464. See also Id. at 465 (collecting United States cases which have referred to the Declaration to interpret provisions of the Constitution and laws of the United States). The preamble of the Declaration makes the principles therein announced expressly applicable to the trust territories. See Temengil II, slip op. at 28.

696

 The actions of the Trust Territory administration set forth in detail above amply demonstrate not only a violation of equal protection principles embodied in the United States Constitution, but of parallel principles found in international law. The right to "equal pay for equal work" is explicit. The Trust Territory, exercising the delegated powers of the administering authority, has express and solemn obligations to not only refrain from engaging in pay discrimination, but to take affirmative steps to ensure that all employees are treated equally. The facts previously set forth conclusively establish that the Trust Territory administration did not take such affirmative steps, but instead intentionally engaged in pay discrimination by compensating employees unequally for equal work.

 The United States fares no better. The international obligations expressed in the Charter, the Agreement and the Declaration are imposed on the United States itself as a member of the international community and as signatory to the documents. It cannot, and does not, escape liability simply because it delegated its duties to an entity which acted in violation of principles of international law. The United States is a trustee imbued with affirmative fiduciary obligations which cannot be delegated. Where delegation of acts has been made, the trustee remains liable for any resulting breach of those obligations.152/

152/ Generally, a trustee is under an obligation to the

697

A comment of the Senate Committee on Foreign Relations, quoted previously by the Court, bears repeating: "[Micronesia] is a U.S. trust territory and if the United States has fulfilled its trust to the inhabitants badly then those responsible for this condition ought to also be responsible for its remedy." S.Rep. No. 223, 90th Cong. 1st Sess. 8(1967)(amending the Peace Corps Act)(quoted in Temengil I, 33 FEP Cases at 1047). The Court finds the United States responsible for the pay inequities imposed by the Trust Territory Administration and is subject to remedial relief to the extent of this Court's jurisdiction.

## VI. CONCLUSION AND RELIEF

The Court concludes that on January 9, 1978 the Trust Territory government was possessed with duties and obligations to guaranty to its employees, at least to those whom it employed or continued to employ within the Commonwealth of the Northern Mariana Islands - the Plaintiffs in this case, the equal protection of the law regardless of national origin. The failure

---

beneficiary not to delegate to others the administration of the trust, although it may properly delegate the authority to do particular acts. Restatement of Trusts, 2d, §171 and comment d. The delegation of governing authority to the Trust Territory is not challenged. However, where a trustee has properly delegated duties to agents, it "is under a duty to the beneficiary to exercise a general supervision over their conduct." Id. at comment k.

as of that date to take action to remedy existing inequities in the compensation of its employees in the Northern Mariana Islands, and the promulgation under Executive Order and perpetuation thereunder of grossly discriminatory wage scales in the following years deprived the plaintiffs of equal protection of the laws guaranteed by the Fourteenth Amendment, 42 U.S.C. §1983 and the Trust Territory Bill of Rights. In addition, the Trust Territory breached its solemn obligations undertaken in the Trusteeship Agreement. The unconstitutionality of this conduct subjects the Trust Territory government to a permanent injunction enjoining the continuation of the inequitable pay practices. Furthermore, the wrongful actions have caused the plaintiffs to suffer monetary injuries entitling them to appropriate relief.

The United States, as well, has breached its duties to the inhabitants of the Trust Territory. Injunctive relief will issue against it.

The parties will set a status conference on these issues of injunctive and monetary relief to be held no later than July 18, 1986.

_June 6, 1986_
Date

_Alfred Laureta_
JUDGE ALFRED LAURETA

699